886 F.2d 1339
 14 Fed.R.Serv.3d 922
 NEW YORK STATE NATIONAL ORGANIZATION FOR WOMEN; New York
City Chapter of the National Organization for Women;
National Organization for Women; Religious Coalition for
Abortion Rights--New York Metropolitan Area; New York State
National Abortion Rights Action League, Inc.; Planned
Parenthood of New York City, Inc.; Eastern Women's Center,
Inc.; Planned Parenthood Clinic (Bronx); Planned
Parenthood Clinic (Brooklyn); Planned Parenthood Margaret
Sanger Clinic (Manhattan); OB-GYN Pavilion; the Center for
Reproductive and Sexual Health; VIP Medical Associates;
Bill Baird Institute (Suffolk); Bill Baird Institute
(Nassau); Dr. Thomas J. Mullin; Bill Baird; Reverend
Beatrice Blair; Rabbi Dennis Math; Reverend Donald Morlan;
Pro Choice Coalition, Plaintiffs-Appellees,
City of New York, Plaintiff-Intervenor-Appellee,
v.
Randall TERRY, Operation Rescue, Rev. James P. Lisante,
Thomas Herlihy, John Does and Jane Does,
Defendants-Appellants.
 Nos. 906, 907, 908, 978, 979, Dockets 88-7873, 88-7915,
88-7969, 88-9103, 89-7121.
 United States Court of Appeals,
Second Circuit.
 Argued March 6, 1989.
Decided Sept. 20, 1989.
 
 Joseph P. Secola, Milford, Conn. (George J. Mercer, The Rutherford Institute of Conn., Milford, Conn., Michael P. Tierney, New York City, A. Lawrence Washburn, Jr., Albany, N.Y., of counsel), for defendants-appellants.
 David D. Cole, New York City (Mary M. Gundrum, Rhonda Copelon, Center for Constitutional Rights, New York City, Alison Wetherfield, Sarah Burns (D.C. Bar only), NOW Legal Defense & Educ. Fund, New York City, Judith Levin, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, of counsel), for plaintiffs-appellees.
 Kristin M. Helmers, New York City, Office of the Corp. Counsel, City of New York, for plaintiff-intervenor-appellee.
 Before CARDAMONE and PRATT, Circuit Judges and LASKER, District Judge*.
 CARDAMONE, Circuit Judge:
 
 
 1
 The principal question presented on this appeal is whether the First Amendment grants Operation Rescue (appellants) the right to engage in activities designed to deny access to abortion clinics to women seeking the services they provide. We must determine if the limitations placed by the district court on appellants' actions and speech square with the constitutional rights guaranteed all citizens under the First Amendment. We think they do.
 
 
 2
 Insofar as appellants' attempts to block ingress and egress to plaintiffs' clinics resulted in Operation Rescue demonstrators' physical presence on the clinics' premises, they were trespassers without right, constitutional or otherwise, to be there. Insofar as appellants' rights of free speech were exercised in close proximity to individual women entering or leaving the clinics so as to tortiously assault or harass them, appellants' rights ended where those women's rights began. There is no constitutional privilege to assault or harass an individual or to invade another's personal space. Hence, the tortious interference with the constitutional rights of those entering or leaving the clinics subjects appellants' First Amendment rights to the limitations contained in the injunction that is the subject of this appeal.
 
 
 3
 Defendants Randall Terry and Operation Rescue appeal from a judgment of the United States District Court for the Southern District of New York (Ward, J.) entered on January 10, 1989, which denied defendants' motion to dismiss; granted plaintiff New York State National Organization for Women's (N.O.W.) and plaintiff-intervenor City of New York's (City) motions for summary judgment on their claims under 42 U.S.C. Sec. 1985(3) (1982) and the New York common law of trespass and public nuisance, respectively; and permanently enjoined defendants from impeding or obstructing ingress into and egress from medical facilities during anti-abortion demonstrations.
 
 
 4
 Appellants challenge the constitutionality of a series of injunctions issued during the course of this litigation, as well as the substantive grounds upon which the permanent injunction is based. See New York State Nat'l Org. for Women v. Terry, 704 F.Supp. 1247 (S.D.N.Y.1989) (decision on the merits resulting in permanent injunction); New York Nat'l Org. for Women v. Terry, 697 F.Supp. 1324 (S.D.N.Y.1988) (contempt order of October 27, 1988). For the reasons that follow the district court's judgment is modified, leaving in place the permanent injunction, and as modified, it is affirmed.
 
 BACKGROUND
 I State Court Proceedings
 
 5
 Plaintiffs commenced this action in New York State Supreme Court on April 25, 1988 seeking declaratory and injunctive relief to restrain Operation Rescue from blocking access to medical facilities providing abortions. The complaint alleged eight separate causes of action: violations of New York Civil Rights Law Sec. 40-c and New York Executive Law Sec. 296; public nuisance; interference with the business of medical facilities; trespass; infliction of emotional harm on patients and employees of medical facilities; tortious harassment of patients and employees of medical facilities; false imprisonment of patients and employees of medical facilities; and conspiracy to deny women seeking abortion or family planning services the equal protection of the laws and equal privileges and immunities, in violation of 42 U.S.C. Sec. 1985(3).
 
 
 6
 On April 28, 1988 a temporary restraining order (TRO) that did not expressly enjoin Operation Rescue from blocking access to health care facilities was issued in New York state court. On May 2, 1988, as a result of a demonstration outside a Manhattan abortion clinic, a second TRO was issued that enjoined Operation Rescue from "trespassing on, blocking, obstructing ingress into or egress from any facility at which abortions are performed in the City of New York, Nassau, Suffolk or Westchester Counties from May 2, 1988 to May 7, 1988." See 697 F.Supp. 1324, 1327 n. 3 (S.D.N.Y.1988). On May 3, 1988 Operation Rescue held a demonstration in Queens outside another abortion clinic at which several hundred participants were arrested. At a hearing held in state court, the City's application to intervene was granted. Defendants then successfully petitioned to remove the suit to federal district court based upon the claim asserted pursuant to 42 U.S.C. Sec. 1985(3).
 
 II District Court Proceedings
 A. The May 4 TRO and Contempt Proceedings
 
 7
 On May 4, 1988 Southern District Judge Ward continued the state court's TRO, but modified it substantially in light of the events of the previous day. In addition to the prohibitions on obstructing ingress and egress, the district court added coercive sanctions of $25,000 for each day that defendants violated the TRO, and required defendants to give advance notification to the City of the location of any planned demonstration. Judge Ward also ruled that failure to give such advance notice would make Operation Rescue liable for excess costs incurred by the City. The district court, as had the state court, granted the City's motion to intervene. Defendants moved on May 5 to vacate the TRO issued the day before for plaintiffs' alleged failure to comply with Fed.R.Civ.P. 65(c). The district court denied the motion on May 6, and we denied defendants' application to stay the TRO pending an expedited appeal.
 
 
 8
 Operation Rescue demonstrated in Hicksville, New York and in Manhattan, on the mornings of May 5 and May 6, respectively. It is undisputed that its leader, defendant Randall Terry, was aware of the TRO but did not alter his written instructions to demonstrators to continue to obstruct access to the abortion clinic. New York City police also read the TRO twice over a megaphone to demonstrators during the May 6 blockade. When the demonstrators failed to comply, 320 of them were arrested.
 
 
 9
 On May 31, 1988 plaintiffs sought civil contempt sanctions against defendants pursuant to Fed.R.Civ.P. 70 and 18 U.S.C. Sec. 401 (1982) as a consequence of the events of May 5th and 6th. The district judge granted the motion and denied defendants' cross-motion to dismiss. In a judgment entered November 4, 1988 defendants Operation Rescue and Terry were held jointly and severally liable for $50,000 in civil contempt sanctions to be paid to plaintiff N.O.W., see 697 F.Supp. at 1329, and in a judgment dated September 9, 1988 for $19,141 to be paid to the City for its costs that resulted from defendants' failure to give advance notice of either demonstration. In so holding, the court rejected Operation Rescue's contentions that the various plaintiffs and plaintiff-intervenor lacked Article III standing and that the contempt proceeding was criminal in nature rather than civil. See id. at 1329-34, 1336-38.
 
 B. The October 27 Preliminary Injunction
 
 10
 Meanwhile, on October 7, 1988, plaintiffs moved to modify the earlier May 2 order that had enjoined defendants from May 2 to May 7. Plaintiffs sought to broaden the injunction to include the period October 28-30, 1988 in response to Operation Rescue's plan to conduct on those dates a "National Day of Rescue." Following a hearing, the trial court on October 2 replaced its earlier TRO with an order containing the same terms as its May 4th TRO. Defendants' application for a stay of that order was denied because counsel was unable to represent that defendants would desist from further demonstrations pending appeal. An application for a stay pending appeal was also denied in this Court. Notwithstanding the modified preliminary injunction, several hundred Operation Rescue followers conducted demonstrations at Dobbs Ferry, New York and at Deer Park in Suffolk County, New York on October 29, blocking in each instance ingress to and egress from an abortion clinic for several hours.
 
 C. The Discovery Dispute
 
 11
 On May 31, 1988 plaintiffs served defendants with two notices of deposition requesting information regarding employment, assets and income pursuant to Fed.R.Civ.P. 30 and 34. Claiming privilege under the First, Fourth, Fifth and Fourteenth Amendments, defendants refused to produce any of the requested documents. Plaintiffs moved to compel discovery; defendants cross-moved for a protective order. In an opinion dated August 31, 1988 Judge Ward denied the cross-motion for a protective order, and awarded plaintiffs the fees and costs of the motion in the amount of $16,142.75 to be paid jointly and severally by defendants and their counsel.
 
 D. The Merits
 
 12
 In November 1988 plaintiffs learned that Operation Rescue had planned demonstrations in front of unspecified clinics in the New York Metropolitan area for the weekend of January 12, 1989. In a November 16 letter to Operation Rescue participants, defendant Terry acknowledged his intention to disobey the district court's contempt order, and asked, "[w]ill we let this N.Y.C. court intimidate us back into silent cooperation with the killing.... [o]r will we face down this judge's order ...?" This threat to continue demonstrations prompted plaintiffs' December 21, 1988 motion for summary judgment and for an order permanently enjoining Operation Rescue from blockading facilities providing abortion-related services.
 
 
 13
 At the same time, defendants' motion to dismiss was pending before the district court. In that motion, defendants renewed their argument that plaintiffs and the City, as plaintiff-intervenor, lacked Article III standing and challenged the sufficiency of the plaintiffs' complaint as to each asserted cause of action. Defendants also asserted that the complaint failed to allege sufficiently grounds for a permanent injunction, and that defendants' earlier notices of appeal had divested the district court of jurisdiction. After hearing oral argument on the consolidated motions, the district judge on January 10 issued a permanent injunction that again enjoined defendants from blocking access to plaintiffs' medical facilities. The amount of sanctions was doubled to $50,000 for each successive act in violation of the injunction.[1]
 
 
 14
 In a January 21, 1989 opinion Judge Ward granted plaintiffs' motion for summary judgment on their common law trespass claim and on their 42 U.S.C. Sec. 1985(3) federal cause of action. As to the latter claim, the court first held that defendants had demonstrated a discriminatory animus toward a class of women choosing abortion, see 704 F.Supp. at 1259, and had conspired to infringe upon such women's constitutionally protected right of interstate travel. See id. at 1259-60. The trial judge also considered plaintiffs' allegations that the conspiracy had threatened to deprive such women of their right to choose abortion, and ruled that their right to privacy had been violated and that there was sufficient state involvement in the violation to state a claim under Sec. 1985(3). It further held that the City had proved all the elements of its public nuisance claim and was therefore entitled to summary judgment. Id. at 1261-62. Finding that plaintiffs had demonstrated success on the merits, the absence of an adequate remedy at law, and that the balance of equities tilted in plaintiffs' favor, it issued an order permanently enjoining Operation Rescue and its participants from blocking ingress into and egress from medical facilities providing abortion-related services. Id. at 1262-63.
 
 
 15
 Defendants now take this consolidated appeal from all of the foregoing judgments and orders. Because of the myriad actions taken in the trial court, we address only those issues that merit discussion.
 
 DISCUSSION
 
 16
 The principal questions presented are discussed as follows: (1) standing, (2) jurisdiction, (3) contempt and sanctions, (4) discovery and costs, (5) summary judgment, and (6) permanent injunction.
 
 I Standing
 
 17
 The "threshold question in every federal case" is whether a federal court has the authority to adjudicate the lawsuit. Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204-05, 45 L.Ed.2d 343 (1975). The limitations placed on federal judicial power have a constitutional dimension, flowing from Article III, and a prudential dimension, derived principally from notions of judicial self-governance. See Allen v. Wright, 468 U.S. 737, 750-52, 104 S.Ct. 3315, 3324-25, 82 L.Ed.2d 556 (1984); Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472-75, 102 S.Ct. 752, 758-60, 70 L.Ed.2d 700 (1982).
 
 
 18
 Article III requires that a party invoking the jurisdiction of a federal court show (1) that as a result of defendants' allegedly illegal conduct, it has personally suffered some actual or threatened injury, (2) which is "fairly traceable" to the challenged actions of defendants, and (3) that is likely to be redressed by grant of the requested relief. See Allen v. Wright, 468 U.S. at 751, 104 S.Ct. at 3324-25; Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758-59. The prudential limitations on jurisdiction require that a plaintiff establish that he or she is the proper proponent of the rights asserted; a litigant may not raise the rights of a third-party, or assert speculative, conjectural or generalized grievances more appropriately resolved by a governmental body, other than the courts. See Valley Forge, 454 U.S. at 474-75, 102 S.Ct. at 759-60. Together, these constitutional requirements and prudential concerns ensure that federal courts adjudicate only concrete disputes in an adversarial factual and legal context. The standing of the different categories of plaintiffs is considered in light of these principles.
 
 A. Health Care Providers
 
 19
 The health care clinics and abortion providers brought suit on behalf of themselves, their employees and their patients.[2] Their complaint alleges an imminent threat of injury to their businesses and requests wholly prospective relief--a declaration that defendants' actions are in violation of law and a permanent injunction prohibiting such actions in the future.
 
 
 20
 Defendants contend that by not producing a single woman denied access to a clinic by their activities, plaintiffs failed to establish injury in fact. See Roe v. Operation Rescue, No. 88-5157, slip op. at 5-7, 1988 WL 137313 88165350 (E.D.Pa. Dec. 20, 1988) (denying standing to physician and abortion clinics because they were not past or present targets of Operation Rescue blockades). Concededly, a plaintiff must show that "he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged conduct," one that is not conjectural or speculative. City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); O'Shea v. Littleton, 414 U.S. 488, 496-97, 94 S.Ct. 669, 676-77, 38 L.Ed.2d 674 (1974) (past exposure to illegal conduct does not show present controversy; more than possibility of repeated illegal action required).
 
 
 21
 In Singleton v. Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the Supreme Court held that physicians had standing to challenge a Missouri statute that excluded from Medicaid funding all abortions except those deemed "medically indicated." 428 U.S. at 108-09. The Court acknowledged that two distinct standing questions were presented: whether the physicians alleged an adequate injury in fact, and whether, as a prudential consideration, the physicians could assert not only their own rights, but also the rights of their putative patients. Id. at 112-13, 96 S.Ct. at 2873. It concluded that the physicians alleged an injury to their own rights because the challenged statute barred payment--that the doctors would otherwise have received--for all nontherapeutic abortions. Id. at 113, 96 S.Ct. at 2873-74. A plurality then held that the physicians could properly assert the constitutional rights of their patients, id. at 113-15, 96 S.Ct. at 2873-75, reasoning that the confidential nature of the relationship of doctor and patient assured the effective presentation of the patient's rights, and that practical obstacles often obstructed a woman's assertion of her own rights. See id. at 116-17, 96 S.Ct. at 2875-76.
 
 
 22
 The plaintiff clinics similarly assert their own right to be free of tortious acts in conducting their business activities. Each clinic at which a demonstration ultimately occurred was, as the record reveals, inoperable because entrance to and exit from the clinic buildings was completely blocked by several hundred Operation Rescue demonstrators sitting or standing in front of the building doors.
 
 
 23
 The clinics also assert the rights of their patients to travel freely to obtain abortion services. And here, too, the enjoyment of those rights is "inextricably bound up with the activity the litigant wishes to pursue," Singleton, 428 U.S. at 114, 96 S.Ct. at 2874. Thus, we are assured that the clinics represent the rights and interests of the women seeking their assistance. See Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati, 822 F.2d 1390, 1396 (6th Cir.1987). Compare Diamond v. Charles, 476 U.S. 54, 65-67, 106 S.Ct. 1697, 1705-06, 90 L.Ed.2d 48 (1986) (denying pediatrician standing to enforce Illinois Abortion Law because injury of lost fees from aborted fetuses based on speculative independent actions of third-party patients, explicitly distinguishing Singleton ).
 
 
 24
 Moreover, defendants' tactics add to the threatened danger that the clinics will suffer a real and immediate injury, because Operation Rescue insists on keeping secret which clinics it has targeted. Absent a known and specific target, each of the plaintiff clinics cannot help but assume that it is the one slated for a disruption of its business activities. This insistence on secrecy coupled with Operation Rescue's ability to muster quickly hundreds of participants at a chosen site necessarily broadens the scope of the threat Operation Rescue poses to all the plaintiff clinics.
 
 
 25
 We think the threat of injury is real and immediate as it relates to the rights of women seeking abortion services. Such individuals typically come to the clinics seeking first trimester abortions; second trimester abortions require more complicated procedures and, often, different facilities. Thus, women seeking first trimester abortions who are denied access by defendants may later be obliged to undergo a medically more serious second trimester abortion. One such uncontradicted case is documented in the record. Consequently, plaintiff health care providers have standing to bring this action on their own behalf and to assert the rights of their patients as well.
 
 B. Organizations
 
 26
 In their complaint and throughout this litigation, plaintiff organizations have sued alleging standing as organizations qua organizations, and also as representatives of their membership.[3] Compare Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79, 102 S.Ct. 1114, 1124-25, 71 L.Ed.2d 214 (1982) (HOME, organization supporting equality in housing opportunities) with Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343-45, 97 S.Ct. 2434, 2441-42, 53 L.Ed.2d 383 (1977) (Washington State Apple Advertising Commission, organization promoting Washington apples). The Supreme Court has held that an organization may have standing under certain conditions solely as a representative of its members, even absent an injury to itself. See New York State Club Ass'n v. City of New York, 487 U.S. 1, 108 S.Ct. 2225, 2232, 101 L.Ed.2d 1 (1988); Int'l Union, United Automobile Workers v. Brock, 477 U.S. 274, 281-82, 106 S.Ct. 2523, 2528-29, 91 L.Ed.2d 228 (1986). These conditions were crystallized in Hunt
 
 
 27
 [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
 
 
 28
 432 U.S. at 343, 97 S.Ct. at 2441. Significantly, the Court also stated that where an organization " 'seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.' " Id. at 343, 97 S.Ct. at 2441 (quoting Warth, 422 U.S. at 515, 95 S.Ct. at 2213). See also New York State Club Ass'n, 108 S.Ct. at 2232 (noting that the purpose of the first Hunt element is "simply to weed out plaintiffs who try to bring cases ... by manufacturing allegations of standing that lack any real foundation"); UAW v. Brock, 477 U.S. at 287-88, 106 S.Ct. at 2531-32 (suggesting that Hunt 's third element is more readily satisfied by injunctive relief than damages that require more particularized proof of injury).
 
 
 29
 These preconditions to representational standing are fully satisfied. First, the organizations consistently alleged that they "intend[ed] to help protect and guarantee women's access to the facilities" and that as a result of Operation Rescue's activities access was denied from April 30 to May 7, 1988 at locations throughout the New York Metropolitan area. These plaintiffs have demonstrated therefore both their legitimate associational interest and an adequate individual interest to satisfy the first Hunt criterion. See UAW v. Brock, 477 U.S. at 290, 106 S.Ct. at 2533 ("[T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others.").
 
 
 30
 Second, it is beyond question that each organization seeks to protect interests germane to its associational purpose. These plaintiffs have repeatedly alleged that they are "dedicated to assuring the constitutional right of women to choose abortion" and to ensuring unobstructed access to family planning facilities.
 
 
 31
 Third, the causes of action alleged and the relief requested do not require the participation of individual members of any organization. Plaintiffs sought and received wholly prospective relief that will inure to the benefit of all members in New York City and the surrounding counties who seek to avail themselves of health care and family planning services. Uncontroverted affidavits of plaintiffs, their members and third-parties, along with certain stipulations of fact entered into by defendants, were sufficient to provide a legal basis for court-ordered interim relief and, ultimately, for the permanent relief granted. See, e.g., N.Y.N.O.W. v. Terry, 704 F.Supp. at 1257-62; N.Y.N.O.W. v. Terry, 697 F.Supp. at 1329-34. Thus, the associational plaintiffs have standing to bring this action as representatives of their members.
 
 C. City of New York
 
 32
 In its intervenor complaint, the City asserted that Operation Rescue's activities constituted a public nuisance endangering the public safety and welfare, and caused a drain on the public fisc due to the need to respond to demonstrations without advance notice. In light of the ample proof at trial supporting these allegations, it is clear that the City has standing to intervene. See Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 109-10, 99 S.Ct. 1601, 1612-13, 60 L.Ed.2d 66 (1979).
 
 II Jurisdiction
 
 33
 On appeal, defendants renew their argument that their timely filed notices of appeal divested the district court of jurisdiction to consider plaintiffs' motion for summary judgment and permanent injunctive relief. Defendants appealed from (1) the October 27 preliminary injunction, (2) the August 31 order awarding plaintiffs fees and expenses under Fed.R.Civ.P. 37(a)(4), (3) the November 4 order directing payment of contempt sanctions to plaintiff N.O.W., and (4) the December 9 order directing Operation Rescue to pay expenses associated with its violation of the TRO to the City of New York.
 
 
 34
 As a general rule, an appeal may be taken only from a final judgment. Because it is a waste of judicial resources for two courts to be considering the same issues in the same case at the same time, the filing of a notice of appeal is jurisdictionally significant; it terminates the district court's consideration and control over those aspects of the case that are on appeal. See Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58, 103 S.Ct. 400, 401-02, 74 L.Ed.2d 225 (1982). Actions thereafter taken by the district court are taken without jurisdiction. See Weiss v. Hunna, 312 F.2d 711, 713 (2d Cir.) (appeal filed divests district court of power to grant or deny relief except with Court of Appeals permission), cert. denied, 374 U.S. 853, 83 S.Ct. 1920, 10 L.Ed.2d 1073 (1963).
 
 
 35
 Congress permits, as an exception to the general rule, an immediate appeal from an interlocutory order that either grants or denies a preliminary injunction. In such case the matter does not leave the district court, but proceeds there on the merits, unless otherwise ordered. Ex parte National Enameling & Stamping Co., 201 U.S. 156, 162, 26 S.Ct. 404, 406, 50 L.Ed. 707 (1906); Thomas v. Board of Educ., Granville Central School Dist., 607 F.2d 1043, 1047 n. 7 (2d Cir.1979), cert. denied, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980). Further, we have held that the filing of a notice of appeal only divests the district court of jurisdiction respecting the questions raised and decided in the order that is on appeal. See Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A., 527 F.2d 966, 972-73 (2d Cir.1975) (settled rule depriving district court of jurisdiction during appeal inapplicable where two independent proceedings involved), cert. denied, 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976); 9 Moore's Federal Practice p 203.11 at 3-54 (2d ed. 1989).
 
 
 36
 The rule is that if an appeal is taken from a judgment determining the entire action, the district court's hands are tied, except to aid the appeal under Fed.R.App.P. 7 and 8, and to correct clerical errors under Fed.R.Civ.P. 60(a). An exception exists from an order granting or denying a preliminary injunction, which does not prevent the district court from proceeding on the merits. Another exception to total divestiture of district court jurisdiction occurs when the judgment appealed from does not determine the entire action, in which case the district court may proceed with those matters not involved in the appeal. See id.
 
 
 37
 For present purposes, the appealability of the district court's grant of a preliminary injunction is moot in light of our earlier denial of a stay of that relief, and because the district court subsequently granted a permanent injunction. The discovery order and contempt judgments with sanctions and expenses are interlocutory orders that must await final judgment. See International Business Machines Corp. v. United States, 493 F.2d 112, 114-15 (2d Cir.1973) (order of civil contempt is interlocutory and unchallengeable by appeal until final judgment), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974). Hence, none of the matters appealed from divested the district court of jurisdiction to proceed on the merits.
 
 III Contempt
 
 38
 Defendants challenge the contempt proceeding arguing that it was criminal in nature, and that even if it were civil the standards for finding a party in civil contempt were not satisfied, and that the amount and disposition of the contempt sanction infringes their First Amendment rights.
 
 A. Civil or Criminal Contempt
 
 39
 Defendants assert that the relief awarded--a $50,000 judgment in favor of N.O.W., and a $19,141 judgment in favor of the City--bears the hallmark of criminal contempt because the judgments impose "unconditional" liability, and that the district court's failure to provide them with an opportunity to cure or purge themselves of contempt was a punitive criminal sanction. They argue that such a criminal penalty may not be imposed because defendants were not afforded the Constitutional protections of a criminal proceeding, such as the right to remain silent and the standard of proof beyond a reasonable doubt. See Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). Absent the threat of imprisonment, these Constitutional due process protections generally are not required in a civil contempt proceeding. See In re Grand Jury Witness, 835 F.2d 437, 441 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1602, 99 L.Ed.2d 917 (1988).
 
 
 40
 The demarcation between civil and criminal contempt is well-established. The two species of contempt are distinguished by determining the purpose for which a sanction was imposed. See Hicks on Behalf of Feiock v. Feiock, 485 U.S. 624, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988) (distinguishing by "the substance of the proceeding and the character of the relief that the proceeding will afford."). A sanction imposed to compel obedience to a lawful court order or to provide compensation to a complaining party is civil. See United States v. United Mine Workers of America, 330 U.S. 258, 303-04, 67 S.Ct. 677, 701-02, 91 L.Ed. 884 (1947); Hess v. New Jersey Transit Rail Operations, Inc., 846 F.2d 114, 115 (2d Cir.1988); In re Grand Jury Witness, 835 F.2d at 440-41; International Business Machines Corp. v. United States, 493 F.2d 112, 115 (2d Cir.1973), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974). A sanction imposed to punish for an offense against the public and to vindicate the authority of the court, that is, not to provide private benefits or relief, is criminal in nature. See United Mine Workers, 330 U.S. at 302-03, 67 S.Ct. at 700-01; Hess, 846 F.2d at 115.
 
 
 41
 The purpose for which the subject sanctions were imposed suggests that they are civil. On May 3, 1988 Operation Rescue conducted a demonstration outside a Queens, New York clinic, ignoring the state court's second TRO, which had been personally served on defendant Terry. As a result, the district court modified the state court's order by including coercive sanctions of $25,000 for each subsequent daily violation of its order. At this point, there is no doubt that the sanctions were entirely conditional and coercive. On the evening of May 4, 1988 defendant Terry was notified by his counsel of the district court's modified order. The following day defendants moved unsuccessfully to vacate it. In short, defendants were forewarned on May 4 and May 5, 1988 that future violations would result in monetary sanctions. The prospectively fixed penalties were plainly intended to coerce compliance with the court's order and to preserve the parties' then-existing legal rights. See Feiock, 108 S.Ct. at 1429-31 (a fine payable into court is remedial and civil "when the defendant can avoid the fine simply by performing the ... act required by the court's order."). Faced on May 5, 1988 with a choice between compliance or noncompliance with the district court's order, defendants chose the latter course.
 
 
 42
 The factual determination of noncompliance--the assessment of whether the standards showing contempt were satisfied--and the resulting imposition of fines necessarily occurred after defendants' ample opportunity to comply had come and gone. Thus, since the sanctions were imposed to compel obedience to a court order they are civil in nature.
 
 B. Finding of Contempt
 
 43
 A court's inherent power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply. See EEOC v. Local 638, Local 28 of Sheet Metal Workers' Int'l Ass'n, 753 F.2d 1172, 1178 (2d Cir.1985), aff'd, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); Powell v. Ward, 643 F.2d 924, 931 (2d Cir.) (per curiam ), cert. denied, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). These prerequisites have been satisfied here.
 
 
 44
 Defendants contend that the district court's May 4 TRO was unclear and unconstitutionally vague because it contained prohibitions on "tortious harassment" and limitations allowing only "reasonably quiet conversation" in sidewalk counseling that are so fraught with ambiguity as to be an unconstitutional hindrance on their First Amendment rights.
 
 
 45
 Fed.R.Civ.P. 65(d) requires that injunctive orders be "specific in terms" and "describe in reasonable detail ... the act or acts sought to be restrained." The Rule was intended to prevent an uncertain or vague decree from becoming the basis for a contempt citation. See Schmidt v. Lessard, 414 U.S. 473, 476, 94 S.Ct. 713, 715, 38 L.Ed.2d 661 (1974) (per curiam ); Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc., 859 F.2d 681, 685 (9th Cir.1988) (order must be reasonably clear so that ordinary person knows precisely what acts are prohibited). To comply with the specificity and clarity requirements, an injunction must "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." In re Baldwin-United Corp., 770 F.2d 328, 339 (2d Cir.1985).
 
 
 46
 The May 5 order was sufficiently clear as to what acts were proscribed. It prohibited trespass and obstruction that had the effect of blocking "ingress into and egress from any facility at which abortions are performed" within a specific geographic area. It barred physical abuse and tortious harassment of patients and employees. These prohibitions were balanced by language expressly permitting sidewalk counseling in a reasonably quiet and nonthreatening manner. Cf. Portland Feminist Women's Health Ctr., 859 F.2d at 685-87 (preliminary injunction prohibiting obstruction of access to clinic upheld under Rule 65(d) and First Amendment). The conduct that lay between that which was prohibited and that which was permitted was sufficiently clear for defendants to ascertain precisely what they could and could not do. Therefore the order was specific enough to serve as the foundation for a contempt citation.
 
 
 47
 Further, there is ample proof of defendants' noncompliance based on the record and the parties' three stipulated statements of fact. It was stipulated that on May 4 defendant Terry received notice from his counsel that the district court had adopted and modified the state court order; that on May 5 and May 6 Operation Rescue conducted demonstrations in Hicksville, New York and in Manhattan; and that defendant Terry "personally participated in physically blocking access to the [Manhattan] abortion facility" and failed to instruct Operation Rescue participants to obey the court order prohibiting their obstruction of the facilities. Moreover, the stipulations suggest that defendants did not diligently attempt to comply with the court order in a reasonable manner. The sequence of events shows that defendants proceeded with the demonstrations, even though there was ample opportunity to comply with the court order either by curtailing their scope or by stopping them altogether. Since no attempt--much less a diligent one--at compliance has been shown, proof of non-compliance was established by clear and convincing evidence. Accordingly, defendants were properly held in contempt and are liable jointly and severally for the sanctions subsequently imposed.
 
 
 48
 Defendants' insistence that Operation Rescue is not an entity subject to being held in contempt is meritless. Although not organized in corporate or partnership form, it produces literature, possesses a mailing address, engages in correspondence, tacitly enrolls a membership, seeks donations in its name and regularly organizes protest demonstrations on a wide scale. Thus, it possesses adequate characteristics of a legal entity to be held in contempt.
 
 
 49
 There is also no doubt that Terry may be held personally liable for civil contempt sanctions because of his acknowledged role as leader of Operation Rescue. His failure to instruct his followers that the TRO prohibited their goal of blocking entry to facilities providing abortion services and his own example of noncompliance subject him to contempt penalties under the express terms of the May 5 order that encompassed "the defendants, the officers, directors, agents and representatives of defendants...." See United Mine Workers, 330 U.S. at 304-06, 67 S.Ct. at 701-02 (adjudging union president, as union leader and organizer of strike, in contempt for non-compliance with order).
 
 C. Amount of Sanctions Awarded City
 
 50
 A civil contempt sanction may, as noted, serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance. See United Mine Workers, 330 U.S. at 303-04, 67 S.Ct. at 701-02; Perfect Fit Indus., Inc. v. Acme Quilting Co., 673 F.2d 53, 56 (2d Cir.), cert. denied, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982). Compensatory sanctions should reimburse the injured party for its actual damages. United Mine Workers, 330 U.S. at 304, 67 S.Ct. at 701-02. When imposing coercive sanctions, a court should consider (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden. Dole Fresh Fruit Co. v. United Banana Co., 821 F.2d 106, 110 (2d Cir.1987); Perfect Fit, 673 F.2d at 57. See also United Mine Workers, 330 U.S. at 304, 67 S.Ct. at 701-02. The ultimate consideration is whether the coercive sanction--here, a fine--is reasonable in relation to the facts. That determination is left to the informed discretion of the district court. See In re Grand Jury Witness, 835 F.2d at 443.
 
 
 51
 The trial court warned defendants that if they failed to provide advance notice, they would be liable for the City's additional costs. The City submitted a statement of excess costs caused by the May 5 and 6 demonstrations. Such constitutes adequate proof of actual losses suffered by the City due to defendants' contumacy, and warranted the district court in directing defendants, jointly and severally, to pay it $19,141.
 
 
 52
 D. Award of Sanctions to N.O.W.
 
 
 53
 Judge Ward also determined that a coercive sanction of $25,000 for each successive act of contempt was appropriate, and that--as an added element of coercion--any such fines were to be paid directly to plaintiff N.O.W. In granting the plaintiffs' motion for civil contempt, he ultimately rendered a judgment of $50,000 in favor of N.O.W., see 697 F.Supp. at 1338. The principles governing sanctions compel a different result with respect to this judgment.
 
 
 54
 Defendants first challenge the sanction arguing that the district court failed to inquire into defendants' financial resources, their capacity to pay such a fine and the consequent seriousness of the burden imposed upon Operation Rescue and Terry. This argument is unpersuasive. At the May 4 TRO hearing, Judge Ward made a reasonable inquiry into defendants' ability to pay the sanction by suggesting that they file affidavits of financial ability. One was never provided. Later, they refused to give plaintiffs any information regarding their financial resources. A contemnor's failure to provide financial information upon which the burden of a sanction may be evaluated "may not be charged ... against the [plaintiffs] or result in a holding that the district court abused its discretion in imposing the sanction." In re Grand Jury Witness, 835 F.2d at 443. Hence, the amount of the sanctions imposed was not inappropriate.
 
 
 55
 But the district court abused its discretion when it allocated this coercive sanction to plaintiff N.O.W. N.O.W. had made no showing of compensable injury or actual loss due to defendants' failure to obey the court order. The district court considered the $50,000 sanction to be a coercive and not a compensatory fine, see 697 F.Supp. at 1332-33, and it believed that directing payment to N.O.W. would enhance the sanction's coercive effect. Id. at 1333. In this view it was mistaken.
 
 
 56
 In United Mine Workers, the Supreme Court acknowledged that civil contempt sanctions could be imposed "to compensate the complainant for losses sustained," based upon evidence of such loss or injury. 330 U.S. at 303-04. A sanction may, of course, be both coercive and compensatory. Yet, some proof of loss must be present to justify its compensatory aspects. See, e.g., General Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1379-80 (9th Cir.1986) (vacating award of $400,000 to complainant because there was nothing in the record to indicate such loss); Shuffler v. Heritage Bank, 720 F.2d 1141, 1148 (9th Cir.1983) (limiting compensatory awards to those losses actually sustained on account of the contempt); Winner Corp. v. H.A. Caesar & Co., 511 F.2d 1010, 1015 (6th Cir.1975).
 
 
 57
 Plaintiffs respond that complainants in earlier cases have been awarded coercive civil sanctions. But such cases are either distinguishable or indicate merely that a complainant's evidentiary burden is not great in the contempt context. See, e.g., State of N.Y. v. Shore Realty Corp., 763 F.2d 49, 54 (2d Cir.1985) (coercive fines for clean-up of hazardous waste may be payable to state for whose benefit orders issued); N.A. Sales Co. v. Chapman Indus. Corp., 736 F.2d 854, 857, 858 n. 1 (2d Cir.1984) (noting that a district court may rely on "general estimates" of loss in calculating a sum designed to coerce compliance).
 
 
 58
 Inasmuch as no proof of loss was offered on behalf of N.O.W., no evidence of actual injury due to Operation Rescue's activities was shown and there was no evidence that awarding the contempt sanction to N.O.W. would have additional coercive effect on defendant's behavior, the district court's order directing defendants jointly and severally to pay a $50,000 contempt sanction to N.O.W. must be modified by directing that sanction to be payable into court.
 
 IV Discovery
 
 59
 Defendants next question the imposition of sanctions under Fed.R.Civ.P. 37(a)(4). Rejecting defendants' cross-motion for a protective order and privileges asserted under the First, Fourth, Fifth and Fourteenth Amendments, Judge Ward held that defendants' resistance to plaintiffs' reasonable discovery requests was not "substantially justified" and therefore awarded costs and fees against defendants and their counsel, jointly and severally, in the amount of $16,142.75.
 
 
 60
 Discovery rulings and the imposition of sanctions under Rule 37(a)(4) are governed by a clear abuse of discretion standard. See National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 642-43, 96 S.Ct. 2778, 2780-81, 49 L.Ed.2d 747 (1976) (per curiam ); Corporation of Lloyd's v. Lloyd's U.S., 831 F.2d 33, 36-37 (2d Cir.1987) (Rule 37(a)(4) sanctions); Robertson v. National Basketball Ass'n, 622 F.2d 34, 35-36 (2d Cir.1980) (discovery rulings). Here there was neither an abuse of discretion nor any viable basis for the broad spectrum of privileges sought by defendants. Because there is no merit in defendants' asserted Fourth and Fourteenth Amendment privileges, nor in Terry's assertion of spousal privilege, or in his argument that the district court lacked authority to order merits discovery until he had an opportunity to appeal the issue of plaintiffs' standing,[4] we discuss only defendants' assertions of privilege under the First and Fifth Amendments.
 
 A. First Amendment Privilege
 
 61
 The Supreme Court has recognized that disclosure compelled under court order may constitute "a restraint on freedom of association." NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 462, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958); see also Gibson v. Florida Legislative Investigation Comm., 372 U.S. 539, 543-44, 83 S.Ct. 889, 892-93, 9 L.Ed.2d 929 (1963) (reversing as unconstitutional contempt conviction upon failure to disclose membership lists to subversive activities committee because disclosure would interfere with associational rights); Bates v. City of Little Rock, 361 U.S. 516, 523-25, 80 S.Ct. 412, 416-18, 4 L.Ed.2d 480 (1960) (reversing convictions upon failure to disclose membership lists because interference with associational rights outweighed government interest in disclosure). Defendants rely on these cases for the proposition that plaintiffs' discovery requests interfere with their First Amendment rights of free speech and association, and that there is no "cogent and compelling" governmental interest to justify the disclosure. Reliance on this line of cases is misplaced.
 
 
 62
 In each of the cited cases the party withholding information from a court or public agency made a prima facie showing that disclosure would infringe its First Amendment rights. For example, in NAACP v. Alabama, the NAACP made an "uncontroverted showing that on past occasions" disclosure of members' identities "exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." 357 U.S. at 462, 78 S.Ct. at 1171-72. Similarly, in Bates there was "substantial uncontroverted evidence that public identification of persons ... as members ... had been followed by harassment and threats of bodily harm." 361 U.S. at 524, 80 S.Ct. at 417. Neither the state's interest in regulating intrastate business, NAACP v. Alabama, 357 U.S. at 464, 78 S.Ct. at 1172-73, nor the city's power to impose licensing taxes, Bates, 361 U.S. at 524-25, 80 S.Ct. at 417-18, outweighed the possible encroachment on First Amendment rights.
 
 
 63
 In contrast, Operation Rescue and Terry do not articulate how compliance with plaintiffs' discovery requests would interfere with their First Amendment activities. They merely assert that plaintiffs cannot identify any compelling interest to be served by compliance. A party resisting discovery need not make a showing of harm or other coercion; but before the burden shifts to plaintiffs to demonstrate the necessary compelling interest in having discovery, defendants must at least articulate some resulting encroachment on their liberties. See Bates, 361 U.S. at 524, 80 S.Ct. at 417; United States v. Citizens State Bank, 612 F.2d 1091, 1093-94 (8th Cir.1980). Mindful of the crucial place speech and associational rights occupy under our constitution, we hasten to add that in making out a prima facie case of harm the burden is light.
 
 
 64
 The discovery requests were directed toward ascertaining defendants' financial capacity to satisfy contempt judgments likely to issue against them. In light of his counsel's assertion that Terry was penniless, it was a relevant inquiry. Operation Rescue members and participants assert that disclosure of bank records and cancelled checks would have an adverse effect on their First Amendment rights, citing Citizens State Bank. There the court found that the district court had erred in not considering the claim of a taxpayer reform group that an Internal Revenue Service summons would infringe upon their right of free association. 612 F.2d at 1093. In that case the taxpayer group had submitted three uncontroverted declarations "detailing the adverse effects of the summons on ... organizational and fundraising activities." Id. at 1094. Having thus made the prima facie showing of "arguable First Amendment infringement," the burden of proof then shifted to the government to demonstrate a compelling need for the documents requested by the IRS summons. Id. See also Baldwin v. Commissioner of Internal Revenue, 648 F.2d 483, 488 (8th Cir.1981) (remanding due to Tax Court's failure to consider appellant's colorable claim of First Amendment privilege against IRS discovery requests).
 
 
 65
 There is no explanation here of how compliance with discovery orders will encroach on defendants' First Amendment rights. The taxpayer group in Citizens, in contrast, alleged that IRS access to documents would discourage potential members from joining the organization for fear of government retaliation. Id. at 1093. Absent a more specific explanation of the consequences of compliance with discovery, defendants failed to make the required initial showing of potential First Amendment infringement. It is therefore unnecessary to weigh those interests advanced by the discovery requests.
 
 B. Fifth Amendment Privilege
 
 66
 Defendants also broadly invoke the protections of the Fifth Amendment, which provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V. The privilege against self-incrimination may "be asserted in any proceeding, civil or criminal ... and ... protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." Kastigar v. United States, 406 U.S. 441, 445-46, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). This privilege is invoked on behalf of Operation Rescue and defendant Terry, individually and as its representative.
 
 
 67
 Operation Rescue can claim no Fifth Amendment privilege since the privilege is " 'limited to its historic function of protecting only the natural individual from compulsory incrimination.' " Bellis v. United States, 417 U.S. 85, 89-90, 94 S.Ct. 2179, 2183-84, 40 L.Ed.2d 678 (1974) (quoting United States v. White, 322 U.S. 694, 701, 64 S.Ct. 1248, 1252, 88 L.Ed. 1542 (1944)). Collective entities such as partnerships, Bellis, 417 U.S. at 96-97, 94 S.Ct. at 2187, and other unincorporated associations, White, 322 U.S. at 699-701, 64 S.Ct. at 1251-52 (union), cannot invoke the personal privilege. Inasmuch as Operation Rescue maintains bank accounts, engages in correspondence and business in its name, employs several people, including an accountant, and generally holds itself out as a separate collective entity, it is an unincorporated association that can make no claim to a Fifth Amendment privilege.
 
 
 68
 Moreover, defendant Terry may not invoke his personal privilege when acting as the representative of Operation Rescue. He appeared at the deposition as Operation Rescue's spokesperson. In that capacity, the discovery requests asked him to produce documents and answer questions relating to Operation Rescue's financial structure and soundness. The discovery requests were reasonable and relevant because of plaintiffs' need to ascertain whether they could request and collect contempt judgments. Cf. Fed.R.Civ.P. 26(b)(1) (scope of discovery permitted under Federal Rules). As custodian of Operation Rescue records and as its representative, Terry has no act of production privilege under the Fifth Amendment, nor could he refuse to answer questions relating to Operation Rescue on the grounds that they may be incriminating. See Braswell v. United States, 487 U.S. 99, 108 S.Ct. 2284, 2295, 101 L.Ed.2d 98 (1988) (corporate custodian may not resist subpoena on ground that his act of production is personally incriminating); Bellis, 417 U.S. at 100, 94 S.Ct. at 2189 (no privilege claimed by custodian of corporate records regardless of how small the corporation); White, 322 U.S. at 699, 64 S.Ct. at 1251 ("In their official capacity [as representatives of a collective entity], they have no privilege against self-incrimination.").
 
 
 69
 Finally, Terry asserts the privilege personally. He argues that the discovery requests as a whole have testimonial significance and may work to incriminate him in now-pending or potential criminal proceedings. During the July 7 deposition, Terry refused to answer over 50 questions. These related to (1) his whereabouts and activities between April 26, 1988 and May 6, 1988, when several demonstrations occurred, (2) Operation Rescue's finances, activities and employees, and (3) his social security number and his wife's assets, income, and involvement with Operation Rescue. Often he invoked several privileges simultaneously without explaining which privileges applied or in what manner. The district court held that Terry could properly refuse to answer questions relating to his activities in late April and early May of 1988. Terry claims privilege with respect to all the questions he refused to answer.
 
 
 70
 Standing alone, a witness' sincere belief is not enough to foreclose his answering or making a disclosure--"his say-so does not of itself establish the hazard of incrimination." Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). In deciding whether a witness or deponent may justifiably refuse to answer a question, the court must determine whether the incriminating nature of the answer is evident, in light of "the implications of the question, in the setting in which it was asked." Id. at 486, 487-89, 71 S.Ct. at 818, 818-19. When the incriminatory nature of the answer is not readily apparent the witness must explain how the answer may incriminate him. See United States v. Edgerton, 734 F.2d 913, 919 (2d Cir.1984) (acknowledging that this burden "forces a witness to come dangerously close to doing that which he is trying to avoid."); see also United States v. Rylander, 460 U.S. 752, 759, 103 S.Ct. 1548, 1553-54, 75 L.Ed.2d 521 (1983).
 
 
 71
 Defendant Terry makes no attempt to explain how his answers may incriminate him, instead arguing that his assertion of privilege "requires no explanation." Concededly, a witness is not required to prove that an answer will be incriminating "in the sense in which a claim is usually required to be established in court," Hoffman, 341 U.S. at 486, 71 S.Ct. at 818, but he must demonstrate that the question and the context in which it was posed somehow present a possibility of incrimination. The questions asked in the case at hand were posed in a civil context in connection with plaintiffs' motion for civil contempt. Except for those questions concerning Terry's activities from April 26, 1988 to May 6, 1988, they requested nothing that could link Terry with criminal activity. We think the district court wisely exercised its discretion in holding that Terry could properly refuse to answer only those questions, but must answer the others.
 
 C. Discovery Costs
 
 72
 Costs associated with plaintiffs' motion to compel discovery in an amount of $16,142.75 were assessed against defendants and their counsel, jointly and severally. Upon granting a motion to compel discovery, a court may "require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay the moving party the reasonable expenses incurred in obtaining the [discovery] order ... unless the court finds that the opposition to the motion was substantially justified...." Fed.R.Civ.P. 37(a)(4).
 
 
 73
 No substantial justification for defendants' broad claims of privilege--except for Terry's personal privilege noted above--existed. The transcript of the deposition indicates that Terry invoked privileges almost entirely on advice from his counsel. Analysis of the claim of privilege leads inevitably to the conclusion that it was made to keep from plaintiffs information necessary to their civil action. In short, defendants' attack on the district court's discovery holdings must fail.
 
 V Summary Judgment
 
 74
 The district court granted plaintiffs' motion for summary judgment, resulting in the issuance of a permanent injunction, on their claim under 42 U.S.C. Sec. 1985(3) and on their state law trespass claim. 704 F.Supp. 1247, 1257-61, 1261 n. 18 (S.D.N.Y.1989). It held that defendants had conspired with discriminatory animus against a class of women to infringe upon their right of interstate travel, id. at 1260, and found defendants had similarly conspired to deprive members of the same class of their right to choose and obtain abortion services. Id. at 1260-61. The district court also granted the City's motion for summary judgment on its public nuisance claim. Id. at 1261-62.
 
 
 75
 Under Fed.R.Civ.P. 56(c) summary judgment is properly granted if the evidence offered demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. A reviewing court must examine the record in the light most favorable to the party opposing the motion, applying the same standards as the district court. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49, 106 S.Ct. 2505, 2509-11, 91 L.Ed.2d 202 (1986); Brady v. Town of Colchester, 863 F.2d 205, 210 (2d Cir.1988). In the case at hand, Judge Ward's decision was based upon the parties' stipulations of fact and upon defendants' public declarations, literature and testimony.
 
 
 76
 We analyze first the substantive bases for granting summary judgment.
 
 A. Section 1985(3)
 Section 1985(3) provides in part that
 
 77
 If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.
 
 
 78
 42 U.S.C. Sec. 1985(3). To prevail on a Sec. 1985(3) claim, a plaintiff must prove that defendants (1) engaged in a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons the equal protection of the laws, or the equal privileges and immunities under the laws; (3) acted in furtherance of the conspiracy; and (4) deprived such person or class of persons the exercise of any right or privilege of a citizen of the United States. See Griffin v. Breckenridge, 403 U.S. 88, 102-03, 91 S.Ct. 1790, 1798-99, 29 L.Ed.2d 338 (1971).
 
 
 79
 It is well-settled that Sec. 1985(3) provides a cause of action for private conspiracies. See United Bhd. of Carpenters & Joiners of America, Local 610 v. Scott, 463 U.S. 825, 832-33, 103 S.Ct. 3352, 3358-59, 77 L.Ed.2d 1049 (1983); Great American Federal Savings & Loan Ass'n v. Novotny, 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979); Griffin, 403 U.S. at 101, 104, 91 S.Ct. at 1799 (Congress may constitutionally provide cause of action against private conspiracies). When the asserted constitutional deprivation is based upon a right guaranteed against government interference--for example, rights secured by the Fourteenth Amendment--plaintiffs must demonstrate some "state involvement." See Carpenters, 463 U.S. at 833, 103 S.Ct. at 3358-59.
 
 
 80
 Despite its applicability to purely private conspiracies, Sec. 1985(3) is limited in two interrelated ways. First, the Supreme Court has emphasized that Sec. 1985(3) may not be construed as a "general federal tort law." Griffin, 403 U.S. at 101-02, 91 S.Ct. at 1797-98. Rather, a plaintiff must demonstrate "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Id. at 102, 91 S.Ct. at 1798. Second, not all classes of persons fall within the protective ambit of Sec. 1985(3). See Carpenters, 463 U.S. at 835-37, 103 S.Ct. at 3359-61. The Supreme Court has specifically left open the question of whether this statute was aimed against any other class-based animus than that directed against blacks and their supporters at the time of its enactment. Carpenters, 463 U.S. at 836-39, 103 S.Ct. at 3360-62; Griffin, 403 U.S. at 102 n. 9, 91 S.Ct. at 1798 n. 9. Legislative history, the Supreme Court acknowledged, supported the view that Sec. 1985(3) went beyond racially motivated conspiracies, but it held that animus based generally upon the economic views or commercial interests of a class were beyond the statute's scope. Carpenters, 463 U.S. at 837-39, 103 S.Ct. at 3360-62. Thus, the threshold issue is whether Sec. 1985(3) encompasses conspiracies motivated by an animus against a class of women seeking medical and abortion-related services.
 
 B. Women as a Protected Class
 
 81
 The broad language of Sec. 1985(3) does not exclude women from its protections. It speaks instead of "persons" and "class[es] of persons," and seeks to secure to them the "equal protection of the laws" and the "equal privileges and immunities under the laws." Moreover, the Act forbids conspiracies that deprive such persons of "any right or privilege of a citizen of the United States." Sec. 1985(3) (emphasis added). Admittedly, the 42nd Congress' principal concern was to protect newly emancipated blacks, and those who championed them, against conspiracies. See Carpenters, 463 U.S. at 836, 103 S.Ct. at 3360 (discussing legislative history). But the Act's supporters in Congress repeatedly stressed the theme of preventing "deprivations which shall attack the equality of rights of American citizens." See Griffin, 403 U.S. at 100, 91 S.Ct. at 1797 (quoting Cong. Globe, 42nd Cong., 1st Sess., App. 478 (remarks of Rep. Shellaburger)).
 
 
 82
 In reviewing history, we should not forget that women in 1871 were not accorded the full rights of citizenship. Today, they are. See, e.g., U.S. Const., amend. XIX (giving women right to vote upon ratification August 18, 1920). Distinctions based upon immutable characteristics such as sex have long been considered invidiously discriminatory. See, e.g., Frontiero v. Richardson, 411 U.S. 677, 687, 93 S.Ct. 1764, 1770-71, 36 L.Ed.2d 583 (1973) (Congress concluded that classifications based on sex are inherently invidious). By its very language Sec. 1985(3) is necessarily tied to evolving notions of equality and citizenship. As conspiracies directed against women are inherently invidious, and repugnant to the notion of equality of rights for all citizens, they are therefore encompassed under the Act.
 
 
 83
 Moreover, this Circuit as well as other Circuits have held that Sec. 1985(3) encompasses women as a class, or classes based on political associations, or those based on ethnicity, none of which groups were specifically contemplated by the 42nd Congress. See Volk v. Coler, 845 F.2d 1422, 1434 (7th Cir.1988) ("Sec. 1985(3) extends ... to conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty."); Conklin v. Lovely, 834 F.2d 543, 549 (6th Cir.1987) (political views); McLean v. International Harvester Co., 817 F.2d 1214, 1218-19 (5th Cir.1987) (section protects classes characterized by "some inherited or immutable characteristic" or by "political beliefs or associations"); Hobson v. Wilson, 737 F.2d 1, 21 (D.C.Cir.1984) (political affiliations with racial overtones), cert. denied, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); Keating v. Carey, 706 F.2d 377, 386-88 (2d Cir.1983) (political affiliation); Life Ins. Co. of North America v. Reichardt, 591 F.2d 499, 505 (9th Cir.1979) (women purchasers of disability insurance); Novotny v. Great American Federal Savings & Loan Ass'n, 584 F.2d 1235, 1241-43 (3d Cir.1978) (en banc ) (women), vacated on other grounds, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); Conroy v. Conroy, 575 F.2d 175, 177 (8th Cir.1978) (sex and ethnicity).
 
 
 84
 We have previously stated that "[a] narrow interpretation of the statute as protecting only blacks and other analogously oppressed minorities is untenable in light of the history of the Act." Keating, 706 F.2d at 387. It is likewise untenable to believe that Congress would provide a statutory remedy against private conspiracies, the purpose of which is to deny rights common to every citizen, and exclude women as a class from the shelter of its protection. We therefore hold that women may constitute a class for purposes of Sec. 1985(3).
 
 
 85
 C. Defendants' Activities Under Sec. 1985(3)
 
 
 86
 The record plainly indicates that defendants engaged in a conspiracy to prevent women from obtaining access to medical facilities. Operation Rescue literature encourages participants to gather in front of clinics and blockade them. Defendants agreed with other individuals to engage in unlawful activity, including violations of both state law and women's constitutional rights. Moreover, defendants facilitated the conspiracy by providing transportation and accommodations to participants. This type of concerted action ultimately involves a conspiracy to engage in unlawful activity.
 
 
 87
 Defendants urge that plaintiffs have demonstrated no class-based animus. They contend that "the concept of animus is one of ill-will." Yet animus merely describes a person's basic attitude or intention, and because defendants' conspiracy is focused entirely on women seeking abortions, their activities reveal an attitude or animus based on gender. Defendants' argument that their actions are directed against an activity, or only a "subgroup" of women rather than women in general, is insufficient to escape the scope of Sec. 1985(3). In most cases of invidious discrimination, violations of constitutional rights occur only in response to the attempts of certain members of a class to do something that the perpetrators found objectionable, such as travelling interstate with the perceived purpose of promoting civil rights. See, e.g., Griffin, 403 U.S. at 90, 91 S.Ct. at 1792-93. It is sophistry for defendants to claim a lack of class-based animus because their actions are directed only against those members of a class who choose to exercise particular rights, but not against class members whose actions do not offend them. The denial of ill-will towards the women they target and the claim that defendants' actions will benefit these women amount to an argument that "we are doing this for your own good"; a contention that usually shields one's actual motive.
 
 
 88
 Defendants cannot seriously urge that they do not intentionally infringe on the right of women to seek access to the clinics. That was one of the major objectives of the demonstrations of May 2, May 3, May 5, May 6 and October 29, 1988 all of which were purposefully aimed to deny the right of women as a class to gain access to clinics. And, to a significant degree, they succeeded. The record is replete with incidents supporting this conclusion and the district court's findings in this regard cannot be said to be clearly erroneous. Consequently, it is apparent that defendants acted within the scope of Sec. 1985(3) by (1) engaging in a conspiracy; (2) against a cognizable class of persons, with invidious class-based animus; and (3) committed the requisite overt acts in furtherance of the conspiracy.
 
 
 89
 The remaining question is whether this conspiracy deprived plaintiffs and the women on whose behalf this claim was asserted of any constitutional right. Plaintiffs allege that these rights were violated in two ways: first, that the conspiracy intended to and did infringe upon women's constitutionally guaranteed right to travel; and, second, that the conspiracy intended to and did infringe upon women's right to obtain abortions.
 
 
 90
 (1) Right to Travel
 
 
 91
 The right to interstate travel is guaranteed by the Constitution. See United States v. Guest, 383 U.S. 745, 758, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966); Griffin, 403 U.S. at 105-06, 91 S.Ct. at 1799-01. Deprivations of that right are actionable under Sec. 1985(3) with no need to show any state action or involvement. Carpenters, 463 U.S. at 832-33, 103 S.Ct. at 3358-59; Novotny, 442 U.S. at 383, 99 S.Ct. at 2354 (Stevens, J., concurring); Griffin, 403 U.S. at 105-06, 91 S.Ct. at 1799-01 (cases "firmly" establish right of interstate travel "is assertable against private as well as governmental interference."). See also Guest, 383 U.S. at 760, 86 S.Ct. at 1179-80 (private conspiracy to infringe upon right to travel actionable under 18 U.S.C. Sec. 241, criminal analogue of Sec. 1985(3)). In Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the Supreme Court held that a residency requirement in a state statute regulating abortion violated the right of interstate travel. Id. at 200, 93 S.Ct. at 751-52 (citing Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)). The High Court specifically held that the right to travel "protects persons who enter [a State] seeking the medical services that are available there." Id.
 
 
 92
 As noted, women referred by out-of-state clinics often travel to New York City seeking its superior medical services. Patients residing in other states, the District of Columbia, and Canada, sometimes must undergo a two-day procedure for second trimester abortions. Moreover, defendants' own literature expresses their understanding that clinics in New York City and its environs are preferred targets of demonstrations because of the range of abortion-related services offered there. Jeannine Michael, a counselor at the Eastern Women's Center testified that "[U]nexpected closure of [a clinic] would be particularly acute for our out-of-state clients, whose travel, work, childcare and financial problems would be greater because they would be more difficult to resolve when some distance from home." Further, the threat of future demonstrations with the consequent closing of clinics may expose women seeking the more medically serious and lengthy second trimester procedures to harm.
 
 
 93
 Such encumbrances constitute an infringement upon these women's right to travel. Thus, plaintiffs are entitled to summary judgment on their Sec. 1985(3) claim due to the deprivation of the individual right of a citizen to unhindered interstate travel to seek medical services.
 
 
 94
 (2) Right to Obtain an Abortion
 
 
 95
 With respect to the right to obtain an abortion, the district court granted plaintiff's motion for summary judgment on this claim as well. It ruled that because the right to privacy stems from the Fourteenth Amendment's prohibition on state or governmental interference, plaintiffs were required to demonstrate "state involvement." The district court reasoned that defendants' failure to notify police officials prior to their demonstrations and, on one occasion, their actual agreement with Dobbs Ferry, New York police that no demonstrators would be arrested, sufficiently showed state involvement for purposes of Sec. 1985(3). 704 F.Supp. at 1260 & n. 16. Whether or not one agrees with this reasoning, having already found the interference with a right to travel an independent constitutional ground upon which to affirm the district court's Sec. 1985(3) holding, it is unnecessary for us to rule on this constitutional claim.
 
 D. Plaintiffs' Trespass Claim
 
 96
 Summary judgment in favor of plaintiffs on their trespass claim was also appropriate. Under New York law, trespass is the interference with a person's right to possession of real property either by an unlawful act or a lawful act performed in an unlawful manner. See Ivancic v. Olmstead, 66 N.Y.2d 349, 352, 497 N.Y.S.2d 326, 488 N.E.2d 72 (1985), cert. denied, 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 658 (1986); Phillips v. Sun Oil Co., 307 N.Y. 328, 331, 121 N.E.2d 249 (1954). To be liable, the trespasser need not anticipate the damaging consequences of his acts, but need only intend the act that amounts to an unlawful intrusion upon and interference with the property rights of another. Phillips, 307 N.Y. at 331, 121 N.E.2d 249. The threat of continuing trespass entitles a property owner to injunctive relief where irreparable injury may result. See Exchange Bakery & Restaurant, Inc. v. Rifkin, 245 N.Y. 260, 268, 157 N.E. 130 (1927).
 
 
 97
 Defendants say that their demonstrations occur entirely on public sidewalks in front of the clinics, and do not involve an intrusion on another's property. But the uncontradicted facts describe intrusions on clinic properties by Operation Rescue demonstrators. Typically they sat on the front steps leading up to the facility's main entrance until police were forced to remove them. Because these findings cannot be said to be clearly erroneous, summary judgment on the trespass claim was proper.
 
 E. City's Public Nuisance Claim
 
 98
 The City of New York claimed that these activities constituted a public nuisance because Operation Rescue demonstrations endanger the safety and welfare of City residents, particularly those women seeking to use plaintiff's clinics and other medical facilities. A public nuisance "consists of conduct ... which [offends or interferes with] the public in the exercise of rights common to all, in a manner such as to ... interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." Copart Indus., Inc. v. Consolidated Edison Co., 41 N.Y.2d 564, 568, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977). The offense, "being one common to the public, should be enjoined at the suit of the sovereign's law officer." New York Trap Rock Corp. v. Town of Clarkstown, 299 N.Y. 77, 84, 85 N.E.2d 873 (1949). Thus, the City is a proper party to bring an action to restrain a public nuisance that allegedly may be injurious to the health and safety of its citizens, see id. at 83-84, 85 N.E.2d 873, and it need not prove that it has suffered any actual, as opposed to threatened, harm in order to obtain injunctive relief. See State of New York v. Shore Realty Corp., 759 F.2d 1032, 1050-52 (2d Cir.1985).
 
 
 99
 As a substantive matter, defendants state that reliance on the public nuisance doctrine is misplaced because a women's right to obtain an abortion is not a right common to all members of the community. Rather, they assert, it is a wholly private right and interference with it is not actionable as a public nuisance. They claim that the City has not alleged interference with rights common to the community at large.
 
 
 100
 The right shown to be disrupted is not, as defendants suggest, merely the right to obtain an abortion. The City intervened to vindicate the more general right of City residents to obtain medical services--a right common to all residents of New York. Women go to the clinics for a panoply of medical, prenatal and counseling services. Abortion may be the principal focus of defendants' efforts, but their tactics interfere with a broader spectrum of rights. The demonstrations simply pose a special threat to women seeking to obtain abortions because of delays and cancellations caused by the blockades.
 
 
 101
 Moreover, as the district court noted, defendants' chosen tactic of en masse demonstrations has obstructed vehicular and pedestrian traffic in New York's already burdened streets. 704 F.Supp. at 1262. We have no doubt that--absent the requested relief--the health and security of a considerable number of persons was and would be endangered by the demonstrations. Accordingly, the district court correctly found that defendants' activities constituted a public nuisance, and properly granted the City summary judgment on this claim.
 
 VI Permanent Injunction
 A. Propriety of Its Issuance
 
 102
 A permanent injunction was issued on January 10, 1989. Because plaintiffs have shown that they are entitled to summary judgment on the foregoing claims, we must consider: (1) whether the district court properly issued the permanent injunction; and (2) if so, whether that injunction is a valid regulation of speech under the First Amendment.
 
 
 103
 Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted. See Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 57, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975). Because plaintiff clinics have standing to assert the rights of their patients, the district court properly made their female patients the primary focus of its analysis. See 704 F.Supp. at 1262-63. Those women denied access cannot be compensated by money damages; injunctive relief alone can assure them the clinics' availability. The record contains abundant evidence to support the conclusion that, absent such relief, prospective women patients will suffer irreparable harm from delayed access to clinics. See, e.g., Affidavits of Jeannine Michael and Dr. Thomas J. Mullin.
 
 
 104
 Further, defendants' stated intent to continue the blockades--notwithstanding the spectre of serious legal and financial consequences--and to act in spite of the district court's orders shows that the harm will be of a continuing nature absent an injunction. The irreparable harm flowing from defendants' activities--including the medical risks and the denial of constitutionally guaranteed rights--is real and threatens to continue. Hence, a permanent injunction properly issued.
 
 
 105
 B. Restriction of Defendants' First Amendment Rights
 
 
 106
 We therefore turn finally to analyze whether the injunction is a valid limitation on defendants' speech under the First Amendment. In reviewing an injunction that restricts the exercise of First Amendment rights, we are charged with independently determining, first, the reasonableness of the government interest and, second, whether the restrictions contained in the injunction at issue are narrowly tailored to further that interest. See Olivieri v. Ward, 801 F.2d 602, 605-06 (2d Cir.1986), cert. denied, 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987).
 
 
 107
 Defendants' actions clearly are a form of political speech protected by the First Amendment. Consistent with the national commitment to the notion that debate on critical public issues should be robust and open, defendants are entitled to express their views on this subject, particularly when standing on a public sidewalk where, since time immemorial, the authority to regulate speech is sharply restricted. See United States v. Grace, 461 U.S. 171, 177-80, 103 S.Ct. 1702, 1706-09, 75 L.Ed.2d 736 (1985).
 
 
 108
 Yet, the First Amendment may not be read to protect a person's right to express their views at any time, in any manner, and in any place of their choosing. See Heffron v. International Soc'y for Krishna Consciousness, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563-64, 69 L.Ed.2d 298 (1981). Operation Rescue's activities are subject to reasonable time, place, and manner restrictions so long as the limitations are (1) content-neutral, (2) narrowly tailored to meet a significant government interest, and (3) leave open ample alternative means of communication. See Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068-69, 82 L.Ed.2d 221 (1984); Heffron, 452 U.S. at 647-48, 101 S.Ct. at 2563-64; Grayned v. City of Rockford, 408 U.S. 104, 115-17, 92 S.Ct. 2294, 2302-04, 33 L.Ed.2d 222 (1972). Assuming that a regulation is content-neutral, the reasonableness of the regulation will often depend upon "[t]he nature of a place [and] 'the pattern of its normal activities.' " Grayned, 408 U.S. at 116, 92 S.Ct. at 2303 (quoting Wright, The Constitution on the Campus, 22 Vand.L.Rev. 1027, 1042 (1969)). Thus, the question "is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." Id. Under these standards, the permanent injunction passes constitutional muster. It makes no content-based distinctions. The order enjoins defendants from: "(a) trespassing on, blocking, or obstructing ingress into and egress from any facility at which abortions are performed [within a prescribed geographic area; and] (b) physically abusing or tortiously harassing persons" entering and leaving such facilities. It specifically permits "sidewalk counseling, consisting of reasonably quiet conversation of a non-threatening nature by not more than two people"; and provides that nothing in its directions is to be construed as limiting the exercise of defendants' legitimate First Amendment rights. See supra note 1.
 
 
 109
 Content-neutral regulations of expression are "those that 'are justified without reference to the content of the regulated speech.' " City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986) (quoting Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)). The primary concern of content-neutrality is that no speech or expression of a "particular content" is "single[d] out" by the government for better or worse treatment. Virginia State Bd. of Pharmacy, 425 U.S. at 771, 96 S.Ct. at 1830; see also Young v. American Mini Theatres, Inc., 427 U.S. 50, 67, 96 S.Ct. 2440, 2450-51, 49 L.Ed.2d 310 (1976) (government regulation of expression may not be sympathetic or hostile toward communicator's message). The test is neutrality. Here, we discern no discrimination against the defendants or their message. The message--that abortion is wrong, immoral, and must be stopped--is not singled out for unfavorable treatment. The injunction is not a ban, nor is it a ban masquerading as a limitation. In fact, the order ensures that a forum remain open to defendants to express their views both to the general public and to those entering or leaving the clinics.
 
 
 110
 As we view it, the order regulates the time, place and manner of expression in a way that neutrally balances the rights of Operation Rescue to express its views, of women to enter the clinics unhindered by an invasion of their rights, and of the clinics to provide necessary medical services. See Clark, 468 U.S. at 298, 104 S.Ct. at 3071 (noting that test for content-neutral time, manner and place restrictions differs little from balancing test of United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968)). Because the injunction balances these conflicting rights and interests, it is narrowly tailored.
 
 
 111
 Defendants are particularly concerned that their chosen manner of exercising their First Amendment rights--blockading and effectively shutting down the clinics--is prohibited by the district court's injunction. But blocking access to public and private buildings has never been upheld as a proper method of communication in an orderly society. See, e.g., Cameron v. Johnson, 390 U.S. 611, 617, 88 S.Ct. 1335, 1338-39, 20 L.Ed.2d 182 (1968) (upholding law that prohibited picketing in front of courthouse unreasonably interfering with free ingress or egress); Cox v. Louisiana, 379 U.S. 559, 562-64, 85 S.Ct. 476, 479-81, 13 L.Ed.2d 487 (1965) (Cox II ); Cox v. Louisiana, 379 U.S. 536, 555, 85 S.Ct. 453, 464-65, 13 L.Ed.2d 471 (1965) (Cox I ) (demonstrators may not cordon off street or entrance to a building allowing no one to pass who refused to listen to them).
 
 
 112
 Further, the injunction effectuates significant governmental interests in maintaining public safety--controlling traffic on the streets and sidewalks of a busy, urban environment; again, it ensures that the constitutional rights of one group are not sacrificed in the interest of the constitutional rights of another. Upon our independent review, we are satisfied therefore that the permanent injunction was appropriately issued in this case and that it did not unreasonably restrict defendants' First Amendment rights.
 
 CONCLUSION
 
 113
 Having examined all of defendants' other contentions, we conclude that they are without merit. Accordingly, the orders of the district court--except the order directing payment of contempt fines of $50,000 to plaintiff N.O.W., which is modified and directed to be paid into court--are affirmed.
 
 
 114
 Modified, and as modified, affirmed.
 
 
 
 *
 Hon. Morris E. Lasker, United States District Court Judge, Southern District of New York, sitting by designation
 
 
 [1]
 The permanent injunction provides as follows:
 UPON the undisputed facts in this case, supported by the affidavits, exhibits, and three statements of stipulated facts, the summons and complaint, and all papers and proceedings herein, and counsel for all parties have appeared and argued before the Court on January 6, 1989, it is hereby
 ORDERED that the defendants, the officers, directors, agents and representatives of defendants, and all other local organizations and persons whomsoever acting in concert with them, and with notice of this order (hereinafter "Operation Rescue participants") are:
 
 
 [1]
 permanently enjoined and restrained in any manner or by any means from:
 a) trespassing on, blocking, or obstructing ingress into or egress from any facility at which abortions are performed in the City of New York, Nassau, Suffolk, or Westchester counties;
 b) physically abusing or tortiously harassing persons entering, leaving, working at, or using any services at any facility at which abortions are performed in the City of New York, Nassau, Suffolk, or Westchester counties; Provided, however, that sidewalk counseling, consisting of reasonably quiet conversation of a nonthreatening nature by not more than two people with each person they are seeking to counsel shall not be prohibited. Also provided that no one is required to accept or listen to sidewalk counseling and that if anyone who wants to, who is sought to be counseled wants to not have counseling, wants to leave, walk away, they shall have the absolute right to do that.
 In addition, provided that this right to sidewalk counseling as defined here shall not limit the right of the Police Department to maintain public order by reasonably necessary rules and regulations as they decide are necessary at each particular demonstration site; and it is further
 ORDERED that nothing in this Order shall be construed to limit Operation Rescue participants' exercise of their legitimate First Amendment rights; and it is further
 ORDERED that the failure to comply with this Order by any Operation Rescue participant with actual notice of the provisions of this Order shall subject him or her to civil damages of $25,000 per day for the first violation of this Order; and it is further
 ORDERED that each successive violation of this Order shall subject the contemnor to a civil contempt fine double that of the previous fine; and it is further
 ORDERED that any amounts collected thereunder shall be paid into the Registry of the Court to be disbursed by further Order of the Court; and it is further
 ORDERED that each contemnor shall be jointly and severally liable for all attorneys' fees and related costs incurred by plaintiffs in relation to enforcement of this Order; and
 Upon application of the City of New York, it is further
 ORDERED that in addition to the per diem amount ordered above, Operation Rescue participants shall be jointly and severally liable to pay any excess costs incurred by the City of New York as a result of Operation Rescue participants' failure to provide the City with advance notice of the location of their demonstrations, unless Operation Rescue participants give the New York City Police Department twelve hours advance notice of the location of each day's demonstrations.
 
 
 [2]
 These plaintiffs include: Eastern Women's Center, Inc.; Planned Parenthood Clinic (Bronx); Planned Parenthood Clinic (Brooklyn); Planned Parenthood Margaret Sanger Clinic (Manhattan); OB-GYN Pavilion; The Center for Reproductive and Sexual Health; VIP Medical Associates; Bill Baird Institute (Suffolk); Bill Baird Institute (Nassau); Bill Baird, Director of Bill Baird Institutes; Dr. Thomas J. Mullin, Medical Director of Eastern Women's Center; Reverend Beatrice Blair, Chairperson of associational plaintiff Religious Coalition for Abortion Rights (RCAR); Rabbi Dennis Math, Vice-President of RCAR; Reverend Donald Morlan, Treasurer of RCAR
 
 
 [3]
 Associational plaintiffs include: New York State N.O.W.; New York City N.O.W.; National N.O.W.; Religious Coalition for Abortion Rights--New York Metropolitan Area (RCAR); New York State National Abortion Rights Action League, Inc.; and Planned Parenthood of New York City, Inc
 
 
 [4]
 Terry argues that the district court lacked authority under United States Catholic Conference v. Abortion Rights Mobilization, Inc., 487 U.S. 80, 108 S.Ct. 2268, 101 L.Ed.2d 69 (1988), to order merits discovery until he had an opportunity to appeal the district court's finding that plaintiffs had standing to sue. But that case concerned whether non-party witnesses, held in contempt for failure to comply with discovery orders, could challenge the district court's subject matter jurisdiction in defense of the contempt citation, notwithstanding the absence of a final judgment in the underlying action. 108 S.Ct. at 2270. Terry is a party and appeal of his contempt citation therefore must await final judgment