Malvina D'ORANGE, Plaintiff,

v.

Charles M. FEELY, Ralph Crudo, and
Crudo & Crudo, P.C., Defendants.

No. 94 Civ. 4157(CBM).

United States District Court,
S.D. New York.

March 17, 1997.

William Dunnegan, New York City, for
Malvina D'Orange.

### Opinion

MOTLEY, District Judge.

## I. BACKGROUND and PROCEDURAL HISTORY

The underlying cause of action in this case arose from the handling of estate funds of

which plaintiff was the sole beneficiary. Plaintiff Malvina D'Orange commenced an action against Charles Feely ("Feely") and Ralph Crudo and Crudo & Crudo (hereinafter referred to collectively as the Crudo defendants) on June 3, 1994, alleging violations of and a conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"). The estate belonged to plaintiff's sister, Clarette Otalera, who died in November, 1989. Feely, a licensed attorney in New York, drafted a will for Otalera in which he was appointed executor to the estate. (*see complaint* ¶ 8.) The will was executed on or about May 9, 1989. (¶ 8.) Simultaneously, Otalera executed a power of attorney to Feely. (¶ 8.) Otalera also gave Feely approximately $60,000 in cash or property to hold in trust and to use on her behalf. (¶ 9.) The Crudo defendants were counsel to the estate during probate proceedings. (¶ 6.)

Plaintiff stood to inherit approximately $255,000. (¶ 11.) Upon the death of Otalera, Feely persuaded D'Orange to forgo a lump sum distribution of her inheritance and to instead allow Feely to provide her with monthly installment payments of $3,000. (¶ 12.) Plaintiff alleged that Feely paid the monthly payment until late 1992 or early 1993 but, at the same time, appropriated approximately $79,000 from the estate for his own benefit. (¶ 14.) Additionally, D'Orange asserted that Feely violated his fiduciary duty to Otalera by spending approximately $43,000 of the $60,000 given to him to be held in trust for Otalera.

D'Orange alleged that on or before early 1993, Feely created false financial reports and accounting of legal services that he never rendered to cover up his misappropriation of the estate funds. (¶¶ 16–18) On May 27, 1993 and October 1, 1993, the Crudo defendants forwarded to plaintiff's counsel the allegedly fraudulent 'fiduciary accounts' that Feely had prepared. (¶¶ 18, 32; Mot. Dismiss Comp. Exs. F, H.). The Crudo defendants made a motion to dismiss arguing that plaintiff failed to state a RICO claim against them. This court granted the Crudo defen-

dants' motion and dismissed plaintiff's complaint against them.

Feely did not respond to D'Orange's complaint within the proscribed period. Accordingly, this court entered a default against him on July 29, 1994. On September 12, 1994, Feely made a motion to vacate the default judgment which this court denied by an order, dated September 30, 1994. On August 9, 1995, following a two day inquest on damages which Feely neglected to attend (his attorney was present), this court entered a default judgment against Feely in the amount of $1, 361, 583. Feely thereafter filed a Notice of Appeal.[1]

On October 3, 1995, D'Orange served Feely with a Notice of Deposition and document request, pursuant to Fed.R.Civ.P. 69 which permits post-judgment discovery. Plaintiff was attempting to determine the amount and location of Feely's assets because she had received nothing from him since she had been granted the $1.3 million default judgment award. When Feely refused to comply with the deposition, plaintiff moved to compel discovery. Feely then cross-moved for an order quashing or modifying the subpoena, or for a protective order from the subpoena, pursuant to Fed.R.Civ.P. 27 and 45. Feely argued that because the case was on appeal, he did not have to comply with post judgment discovery.

On November 13, 1995, this court granted plaintiff's motion to compel discovery, denied Feely's cross-motion to quash the subpoena, and ordered Feely to appear for his deposition on November 20, 1995 and to disclose his assets in connection with the judgment entered against him. Feely appealed this order and received a stay, on November 17, 1995, from the United States Court of Appeals, Second Circuit. On January 23, 1996, the Second Circuit vacated its stay of this court's November 13, 1995 order regarding discovery. On February 2, 1996, plaintiff submitted another written request compelling post-judgment discovery. Accordingly, by order dated February 14, 1996, this court again ordered Feely to comply with discovery and to appear for deposition at the courthouse on February 23, 1996. Feely and his

---

1. On August 8, 1996, the Second Circuit affirmed this court's judgment.

attorney, Mr. Wales, attended the court ordered deposition but produced a single page of one bank account statement, and either refused to answer or answered vaguely the questions posed by plaintiff's counsel. (*Pltf. Not. Mot. Contempt Ex. D* ).

On March 29, 1996, plaintiff moved for an order adjudging Feely in civil contempt of the November 13, 1995 and February 14, 1996 orders of this court, pursuant to 18 U.S.C. § 401.[2] In May, 1996, D'Orange died. Due to the Queens Surrogate Court's delay in appointing an executrix of the estate, Feely's contempt hearing was postponed on a number of occasions. At a contempt hearing held on June 28, 1996, this court directed plaintiff's counsel to make a motion for the substitution of parties, since the plaintiff was deceased. On August 22, 1996, this court held another contempt hearing. Prior to the hearing and pursuant to Rule 25(a)(1),[3] on June 20, 1996, defendant's new counselor, Ronald Cohen ("Cohen"), filed and served a statement of plaintiff's death. As a result, Cohen objected to the August 22 contempt proceeding because plaintiff's counsel had not made the directed motion and asked for an adjournment of the hearing on the grounds that there was no proper party in the case.

Plaintiff's counsel informed the court that the motion had not been made because the Surrogate Court had still not appointed an executrix. Over the strong objection of Cohen, the court informed both parties that the hearing would proceed since a contempt proceeding for the violation of court's orders was sui generis. The court reasoned that although plaintiff's motion brought Feely's violation to the court's attention, the court had the inherent power to inquire as to whether its orders had been disobeyed. The court

noted that there was no way of determining the extent of the delay in the Surrogate Court and that according to the rules, it could appoint a substitute party whenever necessary. Cohen indicated that under Rule 25 a motion for a substitute party had to be made ninety (90) days after the statement of death was put on the record. Since the plaintiff's death was put on the record in June, the court noted that September 27, 1996 was the last day a motion could be made by the person appointed by the Surrogate Court. At the close of the hearing, the court directed both sides to submit papers citing the transcript of the hearing on the issue of Feely's contempt.

On several different occasions, Cohen wrote the court requesting leave to withdraw as defendant's counsel, citing Rule 25 to argue that because there had been no substitution of parties, the contempt motion should have been dismissed as of September 27, 1996. Cohen argued that Feely was completely uncooperative as a client and had not paid him for his services and that he was in the process of suing Feely for his attorney's fees. The court denied Cohen's request.[4] On October 11, 1996, Lenora Albano informed the court that she was appointed the executrix of the D'Orange estate by the Surrogate Court and that she was retaining Bruce DiCicco as the attorney for the estate and related matters, including the district court contempt action. On October 17, 1996, DiCicco requested an extension to file the briefs on the contempt issue since William Dunnegan, the trial attorney, had recently withdrawn from the case. The court granted the extension.

**2.** The statute reads in relevant part; "A court of the United States shall have the power to punish by free or imprisonment, at its discretion, such contempt of its authority, and none other, as ... (1) Misbehavior of any person in its presence as to obstruct the administration of justice; ... (2) Disobedience or resistance to its ... order ...". 18 U.S.C. § 401.

**3.** The statute reads in relevant part, "If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties ... unless the motion for substitution is made not later than 90 days after the death is

suggested upon the record by service of a statement of the fact of the death ... the action shall be dismissed as to the deceased party." Fed. R.Civ.P. Rule 25(a)(1).

**4.** To the court's knowledge, there has been at least four different attorneys, Mr. Wales, Mr. Cohn, Mr. Strongberg, and Bass & Ullman, who have acted in one way or another as Feely's counsel during the course of this case. The court informed Cohen when he replaced defendant's former attorney that he would not be allowed to withdraw from this case.

On November 15, 1996, Cohen submitted a post-hearing memorandum arguing that Feely complied with this court's orders but did not cite the transcript to support his position, as this court had directed. Cohen also sent a copy of the memo to Feely. Cohen maintained that he had no intentions of paying for the transcript since Feely had not paid him. He asserted that the memorandum was based on his 'clear' recollection of the contempt hearing. Four days later, Ms. Albano informed the Court that she lacked the funds to continue the pending contempt action against Feely and sought the relief of the court in whatever capacity it deemed appropriate. Plaintiff, therefore, did not submit a brief.

On January 17, 1997, this court held a conference on the issue of Feely's contempt. Albano, the executrix; DiCicco, the estate attorney; Dunnegan, plaintiff's former trial attorney; and Feely were present. Cohen did not appear, despite the direct orders of this court. At the hearing and pursuant to 28 U.S.C.1915,[5] this court had planned to direct plaintiff to file an affidavit attesting to the estate's lack of funding and to appoint Dunnegan as plaintiff's attorney, granting him attorney fees as in other cases. However, Dunnegan informed the court that the estate did in fact have money, approximately § 120, 000 in cash, which had been recovered from the New York State client protection find which protects clients from fraud committed by their attorneys.[6] (*see Transcript of Contempt Hearing dated January 17, 1997*, p. 3–4). The money had actually been recovered by D'Orange a few days prior to her death and now belonged to her estate. (*Tr.* p. 6). Albano, who was also a one-third beneficiary of D'Orange's estate, indicated that it was the other two beneficiaries who

did not see the utility in pursuing litigation against Feely as they saw no hope of recovering from Feely and, therefore, did not wish to use the limited resources to proceed in the action. (*Tr.* p. 3).

The court noted that although plaintiff did not wish to proceed, the court had an interest in vindicating its authority, since during the history of this case, Feely had exhibited continuous disrespect of and refusal to obey court orders. At the close of the hearing, the court indicated that it would make its findings of fact and conclusions of law as to Feely's civil contempt and would initiate a criminal contempt proceeding against him by referring the case to the United States Attorney.

## II. Civil or Criminal Contempt

 It is a firmly established principal that federal courts possess the inherent power to punish for contempt. *see, Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27, (1991) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.") (quotation omitted); *Young v. United States ex rel. Vuitton et Fils, S.A.*, 481 U.S. 787, 795, 107 S.Ct. 2124, 2131, 95 L.Ed.2d 740 (1987); *Abrams v. Terry*, 45 F.3d 17 (2d Cir.1995). These powers reach conduct before the court and beyond the court's confines, *Young*, 481 U.S. at 798, 107 S.Ct. at 2132–33, and are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43, 111 S.Ct. at 2132 (quoting *Link v. Wa-*

5. This section reads in relevant part; "the court may request an attorney to represent any such person unable to employ counsel and may dismiss the case if the allegation of poverty is untrue ... judgment may be rendered for costs at the conclusion of the suit or action as in other cases, but the United States shall not be liable for any of the costs thus incurred." 28 U.S.C. 1915(d), (e).

6. The statute creating the fund reads in relevant part, "the court of appeals shall appoint a board of trustees to administer the lawyers' find for

client protection of the state of New York ... The board shall have the power to receive, hold, manage and distribute the funds collected hereunder for the purpose of maintaining the integrity and protecting the good name of the legal profession by reimbursing, in the discretion of the trustees to the extent they may deem proper and reasonable, losses caused by the dishonest conduct of attorneys admitted to practice in this state ... dishonest conduct' shall mean misappropriation or wilful misapplication of clients' money ..." 30 N.Y. JUD § 468–b (1), (2).

*bash R.R. Co.,* 370 U.S. 626, 630–31, 82 S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962)).

■ A court's inherent power to hold a party in civil contempt may only be exercised when "(1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply." *N.Y. State Nat. Organization for Women v. Terry,* 886 F.2d 1339 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *EEOC v. Local 638, Local 28 of Sheet Metal Workers' Int'l Ass'n,* 753 F.2d 1172, 1178 (2d Cir.1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); *Nudelman v. Siag,* 1996 WL 451379, 2 (S.D.N.Y.1996). In the matter before this court, it is clear that the prerequisites for holding a party in civil contempt have been met.

This court's November 13, 1995 and February 14, 1996 orders specifically directed Feely to comply with Plaintiff's Notice of Deposition. Feely did not violate this court's November 13, 1995 order by not appearing at the scheduled deposition since he legitimately received a stay from the Second Circuit. However, Feely in no way complied with this court's February 14, 1996 order. At his February 23, 1996 deposition, Feely did not produce the requested documents (except for a single page of a bank statement) and refused to answer many questions posed to him at his deposition, sometimes at the instruction of his attorney, Mr. Wales.

At the contempt hearing held in August, Feely's deposition transcript was offered into evidence by plaintiff, without objection, as proof of Feely's failure to produce documents pertaining to his assets and interests. Defendant argues that the order did not require the production of particular documents nor the answering of specific questions, particularly those pertaining to Feely's clients and their accounts. Essentially, defendant argues that because the order was unclear and ambiguous, he cannot be held in contempt. However, it is clear that Plaintiff's Notice of Deposition requested the following:

' 1. Bank accounts in which Feely had an interest since 1990.

2. Real and personal property owned by Feely since 1990.

3. Assets currently owned by Feely.

4. Income earned by Feely since 1990.

5. Feely's federal tax returns since 1990.

Furthermore, the notice clearly stated that 'Feely shall bring with him all documents in his possession, custody or control that *refer or relate* to the subjects listed.' Hence, by order, Feely was directed to bring any documents that 'referred or related' to plaintiff's request.

Feely produced a single page of a bank statement from Citibank. However, during the deposition, it was revealed that there were at least two other bank accounts at Chemical Bank in which Feely's name was listed as the signatory of the account. When questioned about these accounts, Feely refused to answer most of the questions. He attempted to excuse his failure to disclose this information by arguing that the appearance of his name on the account did not necessarily mean that he had an interest in the accounts. For example, the following is an excerpt from the transcript of the deposition:

Q: What is the title of those accounts at Chemical bank?

A: I am not sure of the formal title.

Q: What is your best recollection?

A: I don't want to guess.

Q: How long have those accounts been open?

A: I am not sure.

Q: What is your best recollection?

A: Again, I am not going to guess.

Q: Have they been open for more than a week?

A: Again, I'm not going to guess.

Q: Did you open them in the last few days?

A: Same response.

Q: ... I am asking about where statements for bank accounts are located?

A: I am not here to talk about clients.

Q: You are refusing to answer.

Wales: He is declining to answer.

A: I am declining to answer.

Feely maintained that the deposition was supposed to be about his assets not his clients, therefore, he brought nothing relating to his clients to the deposition. However due to the nature of the proceeding, defendant failed to produce any documents showing a distinction between his interest, if any, in those accounts or any other accounts he may have been holding for his clients. The following exchange occurred at the contempt hearing:

Q: Do you have any documents which would show whose money it is that is in those accounts?

A: Yes.

Q: Did you produce that at the deposition?

A: Absolutely not. It's not called for. It was not requested and was not required.

Q: Do you have any documents which would show that the money in the Chemical Bank account is not your money?

A: Yes.

Q: Did you produce those documents at the deposition?

A: Not called for, not requested, not required....

Q: Do you recall being asked at the deposition whether you had any documents to show that the money in the client accounts was your money or a client's money?

A: ... They were client funds, not mine, therefore not a proper subject at that deposition ... However, I believe an offer was made to the Court that those documents would be given to the Court for the Court's inspection. I had no problem with that because that would keep the names out.

THE COURT: Do we have that? .... Have you sent something to me?

A: Oh, did I, your honor? No. No, I did not send a document to the Court. My attorney had suggested that as an easy response.

Furthermore, when Feely was asked about his interests in an apartment he and his sister purchased in 1990 or 1991 and his failure to produce any documents pertaining to this investment, Feely asserted that he did not produce any documents because he had no interest in the apartment. Although evidence was submitted at the inquest showing that Feely drew a check from the D'Orange estate and had given it to the former owner of the apartment, Feely maintained that his sister was the sole investor and owner of the property and that the 1% interest he was purported to have in the property was merely nominal. He asserted that he did not produce or look for any documents to disprove that the check drawn on the D'Orange estate was not for the purchase of the apartment nor did he attempt to show that his sister was the purchaser because both transactions were 'client information.' Feely did note, however, that although he did not have any documentation of the transaction, anyone could get them because they were public information, as the apartment was purchased as a part of a bankruptcy proceeding in federal court. (*see Transcript of Contempt Hearing dated August 22, 1996,* p. 44).

Lastly, plaintiff argued that Feely ignored this court's order by failing to produce any documents pertaining to his income or tax returns from 1990 to 1995. In defense, Feely argued that because he had asked and been granted, by the IRS, an extension to file his 1995 tax return, he did not have a 1995 tax return to bring to his deposition. He also argued that his returns from prior years had been lost in his computer when it crashed in April and August of 1995. When asked whether he brought a copy of the extension letter to the deposition and whether he attempted to get copies of his prior returns from the IRS, Feely said no.

In regards to his income, Feely maintained that all such information was stored in his computer and was lost as a result of the crash. When asked about his income since the crash in August of 1995, Feely responded that there was virtually none (*Tr.* p. 61) and that he could not think of the location of documentation showing the income he did make. When pressed on the issue and asked about what he did with payments he received for his legal services or from what accounts he paid his credit cards, lawyers and other

expenses, Feely either said he could not remember or would not disclose the information because he did not want to speak for the third parties he alleged were paying his attorney fees. (*Tr.* p. 53).

It is clear from the record before the court that Feely has disobeyed the court's February 16, 1996 order to answer questions and to produce any documents relating or referring to the subjects listed in plaintiff's deposition notice. Feely is, therefore, in contempt of this court's order of February 16, 1996. Plaintiff's estate has elected, however, not to pursue this civil contempt finding.

■ The Supreme Court has established a demarcation between civil and criminal contempt. In *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911), the Court emphasized that in order to determine whether a contempt is civil or criminal turns on the substance of the contempt proceeding and the 'character and purpose' of the sanction involved. *Id.* at 441, 31 S.Ct. at 498; *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). A contempt sanction is considered civil if it is remedial and for the benefit of the complainant, and criminal if it is punitive, to vindicate the authority of the court. *see, United Mine Workers v. Bagwell*, 512 U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994); *see also, N.Y. State Nat. Organization for Women v. Terry*, 886 F.2d 1339 (2d Cir.1989) ("A sanction imposed to punish for an offense against the public and to vindicate the authority of the court, that is, not to provide private benefits or relief, is criminal in nature") (citing *United States v. United Mine Workers of America*, 330 U.S. 258, 302–03, 67 S.Ct. 677, 700–01, 91 L.Ed. 884 (1947)).

■ In this case, since Feely has consistently failed to furnish this court with substantive financial information, such as bank statements, concerning funds that had been committed to his care and neglected to provide information about his assets and the disposition of plaintiff's funds, the primary objective of the court is to vindicate its authority and to punish Feely, a licensed attorney, for offending the public by evading plaintiff's discovery inquiries and post-judgment discovery.[7] Hence, given the well established distinction between civil and criminal contempt and given the circumstances of this case, primarily plaintiff's withdrawal, a sanctioning by this court would be more criminal in nature.

■ The Supreme Court has ruled that before a criminal "sanction can be imposed on a defendant he must be afforded the Constitutional protections of a criminal proceeding, such as the right to remain silent and the standard of proof beyond a reasonable doubt." *Organization for Women* 886 F.2d at 1350. Thus far, the proceedings against Feely have been civil. This court is prohibited from holding him in criminal contempt without having first afforded him the Constitutional protections of a criminal proceeding. However, this court is vested with the independent authority to initiate criminal contempt proceedings against those who violate its orders. *see, In re Slovenec*, 799 F.Supp. 1441, 1447 (W.D.N.Y.1992).

In *Young*, 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740, the Supreme Court noted that a court should first refer the matter to the appropriate prosecuting authority, like the public prosecutor who the court can reasonably expect to accept the responsibility for prosecution. *Id.* at 801, 107 S.Ct. at 2134–35. To support its position, the Court cited the United States Attorney's Manual § 9–39.318 (1984) which expressly provided "in the great majority of cases the dedication of the executive branch to the preservation of respect for judicial authority makes the acceptance by the U.S. Attorney of the court's request to prosecute a mere formality . . .". *Id.*

At the last civil contempt hearing, Feely was put on notice that a criminal contempt proceeding would be initiated against him based on the evidence presented at the civil

---

7. It has been brought to the court's attention that Feely has failed to obey court orders in the Surrogates Court and two other courts and that Feely has been suspended from practicing law by order of the Appellate Division, First Department, following an investigation by its disciplinary committee with respect to the underlying allegation in this case and Feely's failure to satisfy the judgment entered against him by this court.

contempt hearings. *see, United States v. Vulpis,* 807 F.Supp. 284, 286 (S.D.N.Y.1991) (Motley, J) ("the evidence adduced at the civil contempt proceeding ... constitute[s] the entire record for the criminal contempt matter"). In *Vulpis,* the plaintiff made a motion to hold defendant in civil contempt and based on the record before the court, the court initiated separate criminal contempt proceedings against the defendant as well. The defendant was found in criminal contempt by this court and his conviction for both civil and criminal contempt were affirmed by the Second Circuit. *see, United States v. Vulpis,* 964 F.2d 1269 (2d Cir.1992). Hence, in the present case, this court hereby refers the matter to the U.S. Attorney to prosecute Feely for criminal contempt.