[Nos. A107538, A108292. First Dist., Div. Two. Oct. 12, 2006.]

NOVARTIS VACCINES AND DIAGNOSTICS, INC., et al., Plaintiffs and Respondents, v.
STOP HUNTINGDON ANIMAL CRUELTY USA, INC., Defendant and Appellant.

1286

**1288**

COUNSEL

Mark Goldowitz for Defendant and Appellant.

O'Melveny & Myers, Daniel H. Bookin, Benjamin J. Smietana and Steven E. Swaney for Plaintiffs and Respondents.

Covington & Burling, Richard A. Jones, Robert A. Long, Jr., and Emily Johnson Henn for National Association for Biomedical Research as Amicus Curiae on behalf of Plaintiffs and Respondents.

OPINION

**HAERLE, Acting P. J.—**

## I. INTRODUCTION

Defendant and appellant Stop Huntingdon Animal Cruelty USA, Inc. (SHAC USA), was formed to support an international campaign to "expose the abusive treatment of animals" by Huntingdon Life Sciences, a biomedical testing laboratory. Respondent Novartis Vaccines and Diagnostics, Inc. (formerly known as Chiron Corporation and referred to herein as Chiron), uses Huntingdon Life Sciences in testing some of its products. After numerous Chiron employees were targeted for "home visits" by SHAC USA—terrifying incidents in which persons broke employees' windows, vandalized their cars, set off ear-piercing alarms in their yards, and left excrement on their doorsteps, as well as other tactics, including the publication of employees' personal information on the Internet and that of employees' spouses and children—Chiron filed suit against SHAC USA seeking injunctive relief.

SHAC USA brought a motion to strike under the California anti-SLAPP (anti-strategic lawsuit against public participation) statute (Code Civ. Proc., § 425.16)[1] in which it argued that the activities that formed the basis of Chiron's suit are protected under the anti-SLAPP statute. The trial court denied this motion to strike and SHAC USA now appeals from this order. SHAC USA argues that the trial court erred because (1) the complaint arises from speech about matters of public interest and (2) Chiron failed to meet its burden of showing a probability that it would prevail on its claims. In addition, defendant argues that the trial court lacked jurisdiction to issue a

---

[1] All further statutory references are to the Code of Civil Procedure, unless otherwise noted.

temporary restraining order and preliminary injunction after defendant appealed from the order denying its motion to strike.

We find these contentions to be without merit and hence affirm the orders appealed from.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Chiron and SHAC USA*

Chiron is a biopharmaceutical company. Its headquarters are in Emeryville, California. Chiron develops vaccines and blood testing products for diseases like AIDS, cancer and hepatitis. As part of its research, Chiron is required by law to perform testing on animals. Huntingdon Life Sciences, a company based in the United Kingdom, has, in the past, performed animal testing and research for Chiron.

Stop Huntingdon Animal Cruelty is, as its name implies, an organization that has targeted Huntingdon Life Sciences because of its use of animals in its research. Founded in Great Britain, SHAC recently incorporated a branch in the United States. We refer to this offshoot of SHAC Great Britain as SHAC USA.

### B. *The Campaign Against Chiron and Its Employees*

Sometime in, apparently, 2003, SHAC USA announced that Chiron had become a "target" of its campaign against Huntingdon. On its Web site, SHAC USA listed the names, home phone numbers, home addresses, and bank account information of Chiron employees. SHAC also listed the names of Chiron employees' spouses and children.

The centerpiece of SHAC's campaign against Chiron is what SHAC describes on its Web site as a "home visit," a euphemism for a terrifying and often destructive nighttime invasion. Three Chiron employees in its Emeryville headquarters were singled out as recipients of these visits.

The first such "visit" occurred in May 2003, at the house of Sean Lance, Chiron's chairman of the board. Prior to the incident, SHAC USA posted Lance's home address and telephone number on its Web site. A few days later, a group of "unknown individuals" entered Lance's property in San Francisco while Lance and his family were asleep inside their house. These

individuals set off a shrieking personal alarm and poured a chemical substance on Lance's front porch, which left a powerful stench. After this incident, SHAC USA posted a message on its Web site. The message stated that the attack on Lance's house was "a warning of things to come if [Chiron] do[es] not sever all ties to Huntingdon Life Sciences immediately." Over the next few months, Lance received other late night "visits," all of which followed the same pattern.

Lance also received phone calls at work and at home, including many phone calls during the middle of the night. In these phone calls, callers shouted slogans attacking Huntingdon Life Sciences and Chiron. They also demanded that Chiron sever its ties to Huntingdon Life Sciences. An unidentified person posted Lance's home phone number on an Internet classified board falsely advertising sexual services. SHAC USA posted the e-mail addresses of Lance's wife and daughters on its Web site. They, too, received harassing e-mails.

SHAC USA also posted the home address and home phone number of Amy Hessler, Patent Associates Manager at Chiron, on its Web site at a location entitled "Targets." At midnight one night in May 2003, several people drove back and forth in front of Hessler's house screaming through bullhorns and left a screeching personal alarm in her front yard. After this incident, SHAC USA posted the following statement on its Web site: "Prepare yourself Chiron because this is only the beginning. As long as you continue to act as a customer for HLS you will be exposed in your neighborhoods and communities. We know how you make your money, and we know where you live!"

Hessler also received many phone calls and messages on her home telephone. The callers would ask whether she killed animals for a living. They would also urge her to "quit HLS." She also began receiving numerous collect calls from strangers. She changed her home telephone number to an unlisted phone number. Hessler's home address was also posted on Craig's List, an Internet bulletin board. The posting stated that Hessler's mother had died and that Hessler was holding an estate sale.

Over the next several months, there were a number of incidents at Hessler's home. At 2:00 a.m. one night a group of protesters gathered at her house and shouted through bullhorns. SHAC USA posted an account on this incident on its Web site, and also posted Hessler's home address. The account states: "Stop doing business with Huntingdon Life Sciences. Until you do we

will be watching you. We will invite ourselves over to your homes and into your private lives." On another night at 2:00 a.m. a number of persons pounded on Hessler's front door and shouted, "Open the door you fucking bitch!"

Linda Short, Chiron's Vice President for Corporate Resources, was also a subject of SHAC USA's "visits." Short's home address and her home telephone numbers were published on the "targets" section of SHAC USA's Web page. On May 15, 2003, a group of people arrived at her house in the middle of the night. They were masked and shouted anti-Chiron slogans through bullhorns. They also left a screeching personal alarm in Short's front yard. Short was the recipient of numerous harassing phone calls. She also discovered that someone had posted her home phone number and fake sales listings on Internet Web sites.

On one occasion, a group of individuals smeared animal feces on the front and back entrances to Short's house, threw mangled stuffed animals in her front yard, and spray-painted slogans, including "puppy killer" and "drop HLS" on her front walkway and the sidewalk. On another occasion, Short discovered that, during the night, someone had permanently etched onto the front and back windshields of her car the slogans "puppy killer" and "drop HLS."

On the night of August 28, 2003, two bombs were detonated at Chiron's headquarters in Emeryville. SHAC USA's president, Kevin Kjonaas, made a public statement that SHAC USA shared the passion of the bombers and that Chiron and its employees should be "very worried."

SHAC USA posted a link on its Web site to a statement by a group that took responsibility for the bombing. This group, "The Revolutionary Cells," stated that: "You might be able to protect your buildings, but can you protect the homes of every employee?"

Less than a month later, SHAC USA again linked to another statement by The Revolutionary Cells, which read: "Hey Sean Lance, and the rest of the Chiron team, how are you sleeping? You never know when your house, your car even, might go boom. Who knows, that new car in the parking lot may be packed with explosives. Or maybe it will be a shot in the dark."

C. *Chiron's Complaint*

Chiron sued SHAC USA in February 2004. Its complaint sought injunctive relief on behalf of Chiron itself and also on behalf of its employees. It alleged that SHAC USA "ratified, authorized, aided and/or abetted the unlawful acts"

of certain individuals. These acts were described at length in the complaint and we have summarized them above.

The first cause of action, for harassment, is brought by Chiron on behalf of its employees under section 527.6. The complaint describes these employees as a "well-defined and easily identifiable group" among whom "there is a well-defined community of interest . . . in being free from Defendants' intimidating and harassing conduct." The actions described at great length in the complaint, and summarized already in this opinion, form the basis of the harassment claim.

In its second cause of action, Chiron asserts a claim on its employees' behalf for intentional infliction of emotional distress.

The third cause of action, based on article I, section 1, of the California Constitution, is brought by Chiron on behalf of its employees who, according to the complaint, have a reasonable expectation of privacy which defendant has invaded.

The fourth cause of action is for the tort of intrusion into private affairs, a common law claim, brought by Chiron on its employees' behalf. This cause of action alleges that defendant has, by its conduct, intentionally intruded upon the solitude and seclusion of Chiron's employees and that these intrusions "would be highly offensive to an ordinarily reasonable person."

Chiron's trespass claim, its fifth cause of action, is brought on its own behalf and also on behalf of its employees. It is based on an event in August 2003 when defendant, without Chiron's consent, entered the property and allegedly planted two explosive devices that detonated, causing damage to real and personal property. In addition, defendant also allegedly entered on real property belonging to Chiron employees throughout California.

D. *The Motion to Strike*

After Chiron filed its complaint, SHAC USA filed a special motion to strike under section 425.16. A week later, Chiron amended its complaint, adding three individual plaintiffs and alleging causes of action for harassment, intentional infliction of emotional distress, violation of the California constitutional right of privacy, intrusion into private affairs, and trespass on behalf of the individual plaintiffs and by Chiron on behalf of these individual plaintiffs. Chiron also alleged causes of action for intentional interference with business relations and violation of Business and Professions code section 17200 on its own behalf.

The trial court denied SHAC USA's motion to strike. On August 12, 2004, SHAC USA appealed from this order of denial.

### E. *The Preliminary Injunction*

On the morning of August 15, 2004, about 35 people, many wearing masks, staged a demonstration at the house of Chiron's general counsel, William Green. The demonstrators carried signs denouncing Chiron and Huntingdon Life Sciences and chanted slogans through bullhorns.

Two groups of demonstrators ran onto Green's property during this time. One group went to the front of the house and the other to the back. They smashed several windows in Green's house and turned a garden hose on and left it running on Green's deck. When one of Green's neighbors tried to prevent them from entering Green's backyard, the demonstrators surrounded him and told him they were going to "kick [his] fucking head in." Informed that the police were on their way, the demonstrators fled, chanting, "We'll be back."

A month before this attack, SHAC USA sent an e-mail to readers. In this e-mail, SHAC USA stated that August 12 through 15 would be a "weekend of action." The e-mail directed SHAC USA's members to "[j]oin activists as they caravan to an HLS supporter's home to let them know that animal abuse will not be tolerated." The e-mail also contained a schedule of the weekend's activities, among which was preparation for "home demonstrations" and instructions to gather for a "home demo" on Sunday, August 15 at 9:00 a.m., the morning Green's house was attacked. In fact, when activists arrived at Green's house, they were carrying a banner that featured the Internet address for SHAC USA's Web site.

On September 10, 2004, Chiron successfully obtained a preliminary injunction against SHAC USA. In issuing this preliminary injunction, the trial court found that "the evidence submitted by the parties provides a compelling showing that SHAC USA has acted in concert with persons who have terrorized Plaintiffs." SHAC USA has also appealed the issuance of this preliminary injunction and we have consolidated these two appeals. We will now address their merits.

### III. DISCUSSION

### A. *Motion to Strike*

#### 1. *Applicable Law*

Defendant's motion to strike was filed under section 425.16, subdivision (b)(1). This section provides that "[a] cause of action against a person

arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

█ In two recent decisions, *Flatley v. Mauro* (2006) 39 Cal.4th 299 [46 Cal.Rptr.3d 606, 139 P.3d 2] (*Flatley*) and *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260 [46 Cal.Rptr.3d 638, 139 P.3d 30] (*Soukup*), our Supreme Court discussed the applicable law in this area. In *Soukup*, the court explained that " 'Section 425.16 posits . . . a two-step process for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.] 'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.' [Citation.]" (*Soukup, supra,* 39 Cal.4th at pp. 278–279.)

█ The "purpose of section 425.16 is to prevent the chilling of the 'valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances' by 'the abuse of the judicial process.' (§ 425.16, subd. (a).)" (*Flately, supra,* 39 Cal.4th at p. 313.) However, as the court pointed out, "[a]s a necessary corollary to this statement, because not all speech or petition activity is constitutionally protected, not all speech or petition activity is protected by section 425.16." (*Ibid.*)

█ In particular, the *Flatley* court held that "section 425.16 cannot be invoked by a defendant whose assertedly protected activity is illegal as a matter of law and, for that reason, not protected by constitutional guarantees of free speech and petition." (*Flatley, supra,* 39 Cal.4th at p. 317.) The court noted that "[a] contrary rule would be inconsistent with the purpose of the anti-SLAPP statute as revealed by its language." (*Ibid.*) In fact, "it would eviscerate the first step of the two-step inquiry set forth in the statute if the defendant's mere assertion that his underlying activity was constitutionally protected sufficed to shift the burden to the plaintiff to establish a probability of prevailing where it could be conclusively shown that the defendant's underlying activity was illegal and not constitutionally protected. While a defendant need only make a prima facie showing that the underlying activity falls within the ambit of the statute, clearly the statute envisions that the courts do more than simply rubber stamp such assertions before moving on to the second step." (*Ibid.*)

The court held, therefore, that "where a defendant brings a motion to strike under section 425.16 based on a claim that the plaintiff's action arises from activity by the defendant in furtherance of the defendant's exercise of protected speech or petition rights, but either the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action. In reaching this conclusion, we emphasize that the question of whether the defendant's underlying conduct was illegal as a matter of law is preliminary, and unrelated to the second prong question of whether the plaintiff has demonstrated a probability of prevailing, and the showing required to establish conduct illegal as a matter of law—either through defendant's concession or by uncontroverted and conclusive evidence—is not the same showing as the plaintiff's second prong showing of probability of prevailing." (*Flatley, supra,* 39 Cal.4th at p. 320.)

Finally, the *Flatley* court summed up our standard of review as follows: " 'Review of an order granting or denying a motion to strike under section 425.16 is de novo. (*Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1056 [18 Cal.Rptr.3d 882].) We consider "the pleadings, and supporting and opposing affidavits upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, . . . [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 [12 Cal.Rptr.3d 786].)' (*Soukup, supra,* [39 Cal.4th at p. 269,] fn. 3.)" (*Flatley, supra,* 39 Cal.4th at pp. 325–326.)

With these principles in mind, we turn now to the issues presented in these appeals.

### 2. *The Motion to Strike*

The trial court found that defendant had not met its burden of proving that Chiron's claims arise from SHAC USA's protected activities[2] and,

---

[2] Specifically, the trial court found that defendant "has not met its burden. The principal thrust or gravamen of Plaintiffs' claims is that [defendant] and its coconspirators should be enjoined from unlawfully harassing or intimidating Chiron and its employees. The information disseminated by [defendant] on its website relates to Plaintiffs' claims as evidence of the existence and modus operandi of a conspiracy and [defendant's] acts of aiding and abetting the alleged unlawful harassment and threats. . . . [T]he Court finds that Plaintiffs' causes of action arise primarily from acts of unlawful harassment and threats, and thus do not 'arise from' an act in furtherance of [defendant's] right of free speech." The court also found that Chiron's claim for invasion of privacy is not a claim that arises of out acts in furtherance of free speech

moreover, that even if they had, Chiron had demonstrated a probability of prevailing on their claims. SHAC USA attacks both these findings.

### a. *Protected Activity*

First, SHAC USA argues that Chiron's complaint is directed at protected activity under the SLAPP statute because it is based almost entirely on speech made in a public forum in connection with an issue of public interest under section 425.16, subdivision (e)(3). SHAC USA also contends that even if the complaint is viewed as involving a mixture of protected and unprotected activities, the court erred in finding its speech was not protected.

Chiron, on the other hand, argues that the gravamen of the complaint is not speech, but the acts of harassment, infliction of emotional distress, intrusion and trespass that occurred during the "home visits" perpetrated by individuals who are unnamed in the complaint. SHAC USA is liable for these acts, Chiron argues, because it conspired with these persons to commit them and this conspiracy was illegal as a matter of law. We agree.

In *Flatley*, the court held when "the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action." (*Flatley, supra,* 39 Cal.4th at p. 320.) Here, the evidence conclusively establishes that the activities described at length in the complaint, and about which there is no dispute, are illegal as a matter of law. Indeed, SHAC USA has conceded that the attacks on Chiron employees were unlawful.

██ Moreover, there is ample evidence that SHAC USA conspired with the demonstrators to commit these wrongful acts. It is well established that evidence of a conspiracy to commit wrongful acts " ' " 'may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.' " ' " (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 785 [157 Cal.Rptr. 392, 598 P.2d 45].) SHAC USA through postings on its Web sites, gave its members essential information for carrying out attacks on the homes of Chiron employees. It named the dates and gathering places, and even supplied its members with the addresses of the targeted Chiron employees. And after these attacks occurred, SHAC USA essentially ratified them by praising them in statements it posted on its Web site.

██ It is simply not the case, as SHAC USA argues, that its statements in furtherance of this conspiracy are protected under the anti-SLAPP statute.

because it is based on "publication of personal information about Chiron's employees" and such information "has little or no connection to any 'issue of public interest' . . . ."

The First Amendment offers no protection for such communications. (*Giboney v. Empire Storage and Ice Co.* (1949) 336 U.S. 490, 498 [93 L.Ed. 834, 69 S.Ct. 684].) In *McCollum v. CBS, Inc.* (1988) 202 Cal.App.3d 989, 999–1000 [249 Cal.Rptr. 187], the court held that "the freedom of speech guaranteed by the First Amendment is not absolute. There are certain limited classes of speech which may be prevented or punished by the state consistent with the principles of the First Amendment: . . . solicitation of crime, complicity of encouragement, conspiracy, and the like . . . ." In short, statements in furtherance of a conspiracy are not the sort of speech section 425.16 was designed to protect.

### b. *Probability of Prevailing on the Merits*

Not only did the trial court correctly find that SHAC USA had failed to show that, under the first prong of section 425.16, Chiron's complaint was aimed at speech, but it also properly concluded that Chiron had met its burden of showing a probability of prevailing on its claims.

Before we discuss this point, however, we must consider a preliminary matter: SHAC USA's argument that the trial court improperly relied on Chiron's first amended complaint, a complaint filed after SHAC USA's motion to strike for the purpose of adding individual plaintiffs.

The simplest answer to this contention is found in the trial court's own words. In its decision, the court unambiguously stated that "the operative pleading is the original Complaint." Thus, the trial court assessed whether Chiron had met its burden of demonstrating a probability of prevailing on the claims asserted in its original complaint. Although SHAC USA states that the trial court relied on the individual claims asserted in the first amended complaint in reaching this issue, this contention is simply factually incorrect.

We turn then to the issue of whether the trial court erred in concluding that Chiron had demonstrated a probability of prevailing on its claims. SHAC USA first argues that Chiron cannot prevail on the claims asserted in its first through fourth causes of action because it may not assert these claims on behalf of its employees. We disagree.

■ In general, a plaintiff may assert a claim on behalf of a third party only when (1) the plaintiff has suffered an injury in fact; (2) the plaintiff has a relationship with the third party so that it can, and will, effectively present the third party's rights; and (3) obstacles exist preventing the third party from asserting his own rights. (*Singleton v. Wulff* (1976) 428 U.S. 106, 113–116 [49 L.Ed.2d 826, 96 S.Ct. 2868]; *N.Y. State Nat. Organization for Women v. Terry* (2d Cir. 1989) 886 F.2d 1339, 1348–1349 (*Terry*).)

In *Terry*, a case that also challenged aggressive tactics against an organization by those opposed to its aims, the court found that health care clinics and abortion providers could sue on behalf of their employees and patients to secure an injunction against protesters whose actions barred access to the clinics. The court reasoned that the clinics had shown an injury in fact by asserting their right to be free of tortious acts in conducting their business activities. (*Terry, supra*, 886 F.2d at p. 1339.) The court also found that the right asserted on behalf of third parties by the clinics to travel freely to obtain abortion services " 'is inextricably bound up with the activity the litigant wishes to pursue.' " (*Id.* at p. 1348.) The court concluded that because of the intertwined nature of the rights asserted by the clinics, "we are assured that the clinics represent the rights and interests of the women seeking their assistance." (*Id.* at p. 1348.)

Here, as in *Terry*, all three prongs of the test are met. First, there is no dispute that Chiron has asserted that it has suffered an injury. Chiron's complaint makes out a trespass claim on its own behalf based on the bombing of its property in Emeryville.

Second, the relationship between Chiron and the third parties it seeks to represent is a strong one, based as it is on the employer-employee relationship. For no reason other than their employment with Chiron, these employees were targeted for vicious and frightening acts of harassment. As their employer, Chiron has a responsibility to effectively present its employees' rights to be free from such conduct. Certainly, Chiron's interest in protecting its employees from harassment due to their employment with Chiron coincides with the employees' interest in being free from such tactics. (See *United States v. Westinghouse Electric Corp.* (3rd Cir. 1980) 638 F.2d 570 [employer permitted to bring invasion of privacy claim on behalf of employees].)

Finally, the obstacles that prevent Chiron employees from asserting their own rights are evident from the complaint. It is unlikely that employees who had already been targeted by SHAC USA would permit themselves to be further targeted by becoming a named party to a lawsuit. (See *Planned Parenthood Golden Gate v. Superior Court* (2000) 83 Cal.App.4th 347, 351 [99 Cal.Rptr.2d 627] [disclosure of private information to antiabortion activists described as "dire" to health clinic employees].)[3]

■ Nor does *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228 [29 Cal.Rptr.3d 521]

---

[3] Because we conclude that Chiron has standing to bring these claims on behalf of its employees under the third party standing line of authority, we do not consider Chiron's additional argument that it also has associational standing to bring these claims on its employees' behalf.

(*Huntingdon Life Sciences*) suggest a different result. In *Huntingdon Life Sciences,* the corporation sought relief on its *own behalf* for damages suffered by its employees for the protestors' infliction of emotional distress and invasion of privacy. (*Id.* at p. 1260.) Despite SHAC USA's claim to the contrary, this decision did not address the question of whether a corporation may bring such claims on its employees' behalf.[4] "A decision, of course, does not stand for a proposition not considered by the court." (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 343 [14 Cal.Rptr.3d 857, 92 P.3d 350].)

*City of Los Angeles v. Animal Defense League* (2006) 135 Cal.App.4th 606, 621–622 [37 Cal.Rptr.3d 632], relied on heavily by SHAC USA at oral argument, does not persuade us to alter our decision. In that case, the court noted that "if the defendant concedes the conduct complained of was illegal, the defendant will be unable to make a prima facie showing the action arises from protected activity within the meaning of section 425.16." (*Ibid.*) In *Animal Defense League,* the court found that the protest activities were well within the law. (*Ibid.*) Here, however, there is no question that the actions of the demonstrators were outside the law, as the court below also found.

In addition, SHAC USA argues that the trial court erred in finding that Chiron had demonstrated a probability of prevailing on its claims because there is insufficient evidence of SHAC USA's responsibility for the tortious acts alleged in the complaint. We disagree.

We note that we review de novo the question of whether the plaintiff has established a reasonable probability of prevailing. A plaintiff is required to make a prima facie showing of facts which would, if proved at trial, support a judgment in plaintiff's favor. We do not weigh the evidence, "but must decide only whether [defendant's evidence] defeat[s] plaintiff's supporting evidence as a matter of law." (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 112 [1 Cal.Rptr.3d 501].)

■ A plaintiff's complaint need only be shown to have "minimal merit" (*Soukup, supra,* 39 Cal.4th at p. 279; *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89, 95 [124 Cal.Rptr.2d 530, 52 P.3d 703].) In considering this issue, we look at the " 'pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' " (*Soukup, supra,* at p. 269.)

---

[4] Shortly before oral argument in this matter, Chiron filed a request for judicial notice of documents intended to demonstrate that the trial court did not, in fact, consider this issue. We deny this request because these materials are simply not relevant to our consideration of either appeal.

 Chiron has met its burden of showing sufficient evidence of SHAC's participation in a conspiracy with the protestors who were involved in the incidents detailed in their complaint. Liability for conspiracy may be imposed upon all those who "concurred in the tortious scheme with knowledge of its unlawful purpose." (*Wyatt v. Union Mortgage Co., supra,* 24 Cal.3d at pp. 784–785.) As we have noted, a finder of fact may infer the requisite concurrence and knowledge from the nature of the acts done, the parties' relations to each other, and the common interest of the alleged conspirators.

 "It is not necessary that the plaintiffs produce evidence showing that the defendants met and actually agreed to undertake the performance of the unlawful act." (*Black v. Sullivan* (1975) 48 Cal.App.3d 557, 567 [122 Cal.Rptr. 119].) "Tacit consent as well as express approval will suffice to hold a person liable as a coconspirator." (*Wyatt v. Union Mortgage Co., supra,* 24 Cal.3d at p. 785.)

 There is more than sufficient evidence in this record, both direct and circumstantial, to support a conclusion that Chiron can show a probability of prevailing on its claims. First, SHAC USA admitted that it made available on its Web site the home addresses and phone numbers of Chiron employees and then encouraged activists to make harassing "home visits" to those employees. Second, SHAC USA published instructions about how to conduct these "home visits." Third, SHAC USA published a calendar on its Web site that directed activists to gather on a specific date to conduct a "home visit." Fourth, SHAC USA took credit for the conduct that occurred. In one particularly chilling statement, after Chiron's headquarters were bombed, SHAC USA's president made a public statement to the effect that SHAC USA "shares the passion of the bombers." He went on to say that Chiron and its employees should be "very worried." SHAC USA also posted a link to an explicit death threat made by an organization called "The Revolutionary Cells," which read: "Hey Sean Lance, and the rest of the Chiron team, how are you sleeping? You never know when your house, your car even, might go boom. Who knows, that new car in the parking lot may be packed with explosives. Or maybe it will be a shot in the dark."

SHAC USA argues that it did not organize the home visits, or authorize or ratify them. The record supports a contrary conclusion. SHAC USA published the information used by activists to target Chiron employees, along with information scheduling these home visits and information instructing activists on how to conduct a "home visit." SHAC USA also effectively ratified this conducted by announcing, with approval, the results of these activities and encouraging persons to continue the harassment. Taken together, this evidence is sufficient on which to base a conspiracy claim.

Similarly, there was evidence in the record that made out a prima facie case of conspiracy with regard to Chiron's claim for the trespass and

bombing of its headquarters. A declaration from one Christine Loscalzo, an FBI special agent assigned to investigate domestic terrorism cases and threats, establishes that on the date of the explosion at Chiron, SHAC USA's president spoke by telephone with one of the people suspected by the FBI to be involved in the bombing. In addition, on its web site, SHAC USA stated that it "share[s] the same passion" as the bombers and it then linked that Web site to one sponsored by those who took credit for the bombing. This is sufficient evidence to make out a prima facie claim that SHAC USA conspired to commit the trespass and bombing of Chiron's headquarters in Emeryville.

### 3. *First Amendment Defense*

SHAC USA also argues that Chiron cannot prevail on the merits, because its claims are aimed at constitutionally protected speech. In *Huntingdon Life Sciences, supra*, 129 Cal.App.4th at pages 1255–1257, the court considered this argument in the context of the same sort of activity directed against Huntingdon Life Sciences. In that case, the court found that SHAC's activities (publishing targets home addresses on the SHAC Web site, making threats of home visits) were not protected activities because they constituted " 'true threats' " which are not protected by the First Amendment. In reaching this conclusion, the court distinguished a case also relied on by SHAC USA, *Brandenburg v. Ohio* (1969) 395 U.S. 444, 447 [23 L.Ed.2d 430, 89 S.Ct. 1827]. *Brandenburg* stands for the proposition that the " 'First Amendment protects speech that advocates violence, so long as the speech is not directed to inciting or producing imminent lawless action and is not likely to incite or produce such action.' " (*Huntingdon Life Sciences, supra*, 129 Cal.App.4th at pp. 1251–1252.) However, the *Huntingdon* court concluded that SHAC's activities were, in fact, likely to incite or produce imminent lawless action. We agree, on very similar facts, with our colleagues' reasoning and reach the same result here.

### 4. *Communications Decency Act*

Finally, SHAC USA argues that it is immune from liability under section 230 of the Communications Decency Act, title 47 United States Code section 230. That statute applies, however, only to "interactive computer services," which are defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server . . . ." There is no evidence in this record that SHAC USA operates in this manner. Moreover, this argument was rejected in *Huntingdon Life Sciences, supra*, 129 Cal.App.4th at page 1258, footnote 9, because there, as here, SHAC put forth "no evidence that SHAC USA's Web site is an 'interactive computer service.' "

## B. *Preliminary Injunction*

SHAC USA appealed from the trial court's denial of its motion to strike Chiron's complaint. After the notice of appeal was filed, the trial court granted a preliminary injunction SHAC USA now argues that, under section 916, the trial court did not have jurisdiction to grant injunctive relief during the pendency of the appeal on the motion to strike.

In *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180 [25 Cal.Rptr.3d 298, 106 P.3d 958], our Supreme Court held that "the perfecting of an appeal from the denial of a special motion to strike automatically stays all further trial court proceedings on the merits upon the causes of action affected by the motion." (*Id.* at p. 186.) This rule is consistent with the general principle articulated in section 916 that "the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, including enforcement of the judgment or order, but the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order."

Although SHAC USA argues that the preliminary injunction disturbs the status quo, in our view that injunction is not a decision on the merits and does not effect the merits of the claim. Thus, for example, in *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1109 [60 Cal.Rptr.2d 277, 929 P.2d 596], the court held that a preliminary injunction is not an adjudication on the merits but, rather, represents the court's "evaluation of the controversy on the record before it at the time of its ruling." (Italics omitted; see also *MaJor v. Miraverde Homeowners Assn.* (1992) 7 Cal.App.4th 618, 623 [9 Cal.Rptr.2d 237].)

*Varian* does not compel a different result. There, the trial court attempted to set a trial date and proceed to trial on the merits of the case although an appeal was spending. The court concluded that these actions were not permitted under section 916. It reasoned that, because a trial on the merits would result in a final judgment on the issue in the appeal, the matter before the court of appeal would have been rendered moot. Here, however, the granting of a preliminary injunction does not render this matter moot, because it is not a decision on the merits.

## IV. DISPOSITION

The orders appealed from are affirmed.

Lambden, J., and Richman, J., concurred.